UNITED STATES of America,

v.

Jamal LAURENT, Defendant.

No. 11–CR–322.

United States District Court,
E.D. New York.

Dec. 2, 2011.

Donna R. Newman, Esq., Buttermore Newman Delanney & Foltz LLP, New York, NY, for Defendant.

Tiana A. Demas, United States Attorney's Office, Brooklyn, NY, Zainab Ahmad, United States Attorney's Office, for the Eastern District of New York, Brooklyn, NY, for Government.

## MEMORANDUM & ORDER

JACK B. WEINSTEIN, Senior District Judge:

I. Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

II. Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81
 A. Prior State Indictment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81
 B. Indictment Under 18 U.S.C. § 922(n) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

II. 18 U.S.C. § 922(n) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82
 A. Legislative History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82
 B. Current Statutory Text . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84
 C. Meaning of "Receive" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84
 D. Government Interest at Stake . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87
 E. Prior Constitutional Challenges . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

IV. Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88
 A. Power of the Grand Jury . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88
 B. Rights of Individuals Under Arrest or Indictment . . . . . . . . . . . . . . . . . 90
 C. Treatment of Unconvicted Conduct . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

V. Constitutionality of 18 U.S.C. § 922(n) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93
 A. Facial vs. As Applied Challenges . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93
 B. Commerce Clause . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94
 C. Fifth Amendment Notice Requirement . . . . . . . . . . . . . . . . . . . . . . . . . . 94
 D. Presumption of Innocence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95
 E. Second Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97
 1. Kinds of Constitutional Scrutiny . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98
 2. Right to Bear Arms . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100
 3. 18 U.S.C. § 922(n) Imposes a Substantial Burden . . . . . . . . . . . . . . 101
 4. No More Than Intermediate Scrutiny is Appropriate . . . . . . . . . . . . 102
 5. 18 U.S.C. § 922(n) Survives Intermediate Scrutiny . . . . . . . . . . . . . 104
 F. Equal Protection . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105
 G. Procedural Due Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106
 1. Private Interest at Stake . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107
 2. Risk of Erroneous Deprivation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108
 3. Government Interest at Stake . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108

VI. Power to Dismiss for Insufficient Evidence . . . . . . . . . . . . . . . . . . . . . . . . . 109

VII. Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110

## I. Introduction

Defendant Jamal Laurent is charged with receipt of a firearm and ammunition while under indictment for a crime punishable by a term of imprisonment exceeding one year. *See* 18 U.S.C. § 922(n). On October 18, 2011, the parties were ordered to show cause why the indictment should not be dismissed on the grounds that § 922(n) is unconstitutional. Ct.'s Order to Show Cause, Doc. Entry 34, Oct. 18, 2011. Concerns raised included that the statute may violate equal protection, the Fifth Amendment's notice requirement, and the presumption of innocence. Defendant subsequently argued that the statute violates his Second Amendment right to keep and bear arms, Def.'s Mem. of L. in Supp. of Mot. to Dismiss, Doc. Entry 46, Nov. 17, 2011, and the Commerce Clause, Def.'s Letter, Doc. Entry 51, Nov. 20, 2011. A hearing on these issues was held on November 21, 2011. *See* Tr. of Hr'g on Order to Show Cause, Nov. 21, 2011.

Challenges to the statute are multifarious. Under § 922(n), the fact of an indictment in any jurisdiction for any felony converts what can be assumed to be an otherwise lawful activity—the shipping, transportation, or receipt of a firearm—into a crime. At the time the defendant commits this act, he has not been convicted of any offense. He has not seen the evidence against him, or had the other protections of due process, including an opportunity to present his own version of events. While the grand jury which originally indicted him determined that there was probable cause of a crime, there has not necessarily been an independent judicial determination that the defendant poses a danger to the community. Despite the absence of these procedural protections, the statute permits the government to both deprive someone of what is arguably a constitutional right to receive a gun, and to punish the exercise of that right with criminal sanctions.

Defendant questions whether the broad prohibition of the statute is necessary to achieve the congressional goals. Arguably, public safety could be adequately protected if the judge in the initial felony case made an individual determination regarding whether the defendant is sufficiently dangerous to be deprived of his right to obtain a gun as a condition of bail. Def.'s Mem. of L. in Supp. of Mot. to Dismiss, Doc. Entry 46, Nov. 17, 2011. *See, e.g.,* 18 U.S.C. § 3142(c)(1)(B)(xiv) (permitting federal courts to set conditions of pre-trial release); N.Y.Crim. Proc. § 530.14 (stating conditions when a trial court may revoke or suspend a defendant's firearms license, order the defendant ineligible for such a license, and order the immediate surrender of any or all firearms owned or possessed). Even if the statute does not violate the presumption of innocence, equal protection, the Commerce Clause, or the Second Amendment, does it run afoul of the Fifth Amendment right to procedural due process?

The issues raised pose the question: is it necessary to impinge on a fundamental right to receive guns with a strict rule when the same interest in public safety might be adequately served while providing appropriate procedural protections to defendants? The answer is that Congress could reasonably respond, "Yes."

For the reasons stated below, the motion to dismiss on constitutional grounds is denied. The facts of this case demonstrate that the statute is constitutional both on its face and as applied to this particular defendant.

Defendant also moved for a bill of particulars specifying when and where the defendant received the firearm in question. Def.'s Mem. of Law in Supp. of Pre–Trial Mot., Doc. Entry 49, Nov. 18, 2011. The

motion was granted. Ct.'s Mem. & Order, Doc. Entry 53, Nov. 23, 2011. In accordance with the terms of § 922(n), the government is required to demonstrate that the defendant received the weapon *after* indictment. If it fails to do so, the indictment will be dismissed without prejudice.

## II. Facts

### A. Prior State Indictment

On June 21, 2010, an individual ("Victim 1") residing at 1445 Schenectady Avenue, Brooklyn, New York reported to the New York City Police Department (NYPD) that someone shot a bullet through the wall of his apartment from the adjoining room. Compl. ¶ 2, Doc. Entry 1, Apr. 11, 2011. Shortly thereafter, the defendant entered Victim 1's room. *Id.* He apologized for the shooting and asked Victim 1 not to report the incident to the police. *Id.*

Later that day, NYPD officers entered the defendant's room and observed a nine millimeter pistol, a spent shell casing, and a bag of marijuana. *Id.* ¶ 3. Although Laurent was present when the NYPD first arrived, he immediately fled the scene on foot. *Id.*

Defendant was arrested by NYPD officers on July 11, 2010 in connection with the June 21, 2010 incident. *Id.* ¶ 4. On July 29, 2010, he was indicted in Kings County Supreme Court for: 1) criminal possession of a weapon in the second degree; 2) reckless endangerment in the first degree; 3) intimidating a witness in the third degree; 4) reckless endangerment in the second degree; 5) criminal possession of a weapon in the fourth degree; and 6) menacing in the third degree. Gov't Resp. to Order to Show Cause 4, Doc. Entry 41, Nov. 16, 2011. Both the first and second counts charged are felonies punishable by a term of imprisonment exceeding one year. *Id.*

Laurent was arraigned on the state court indictment on August 24, 2010. *Id.*

The charges, as amended, are still pending. *Id.* He currently stands indicted for intimidating a witness in the third degree, a felony, and menacing in the third degree, a misdemeanor. Gov't Resp. to Order to Show Cause Ex. A, Doc. Entry 41, Nov. 16, 2011. It is defense counsel's view that he may be permitted to plead guilty to a misdemeanor. Def.'s Mem. of L. in Supp. of Mot. to Dismiss 2 n. 2, Doc. Entry 45, Nov. 17, 2011.

### B. Indictment Under 18 U.S.C. § 922(n)

On March 21, 2011, eight months after his initial state indictment, two NYPD officers witnessed an altercation between defendant and another victim ("Victim 2"). Victim 2 shouted to the officers that he was being robbed and that the defendant had a gun. Compl. ¶ 7, Doc. Entry 1, Apr. 11, 2011. When Laurent ran, the officers pursued him. *Id.* They caught up with him while he was attempting to hide behind a tree. *Id.* He was ordered to come out with his hands up; Laurent complied and was placed under arrest. *Id.* When the police officers searched the area where he had tried to hide, they located a .38 caliber revolver, a brown wallet, and $3,000 in cash. *Id.* ¶ 8. Victim 2 identified the wallet and cash as his. *Id.*

On May 9, 2011, the defendant was arraigned in federal court on a single-count indictment for receiving a firearm in violation of 18 U.S.C. § 922(n). Indictment, Doc. Entry 9, Apr. 26, 2011. Section 922(n) reads as follows:

> It shall be *unlawful for any person who is under indictment for a crime punishable by imprisonment for a term exceeding one year to* ship or transport in interstate or foreign commerce any firearm or ammunition or *receive any firearm* or ammunition which has been shipped or transported in interstate or foreign commerce.

18 U.S.C. § 922(n) (emphasis added). A superseding indictment on the same charge was filed on November 22, 2011. Superseding Indictment, Doc. Entry 52, Nov. 22, 2011.

### III. 18 U.S.C. § 922(n)

#### A. Legislative History

The federal government and many states now limit indictees' access to guns. *See, e.g.,* Ohio Rev.Code Ann. § 2923.13(A)(2)-(3) ("Unless relieved from disability as provided in section 2923.14 of the Revised Code, no person shall knowingly acquire, have, carry, or use any firearm or dangerous ordnance, if ... [t]he person is under indictment for ... any felony offense of violence" or "is under indictment for ... any felony offense involving the illegal possession, use, sale, administration, distribution, or trafficking in any drug of abuse."); Wash. Rev.Code § 9.41.040(2)(a)(iv) ("A person, whether an adult or juvenile, is guilty of the crime of unlawful possession of a firearm in the second degree, if the person does not qualify under subsection (1) of this section for the crime of unlawful possession of a firearm in the first degree and the person owns, has in his or her possession, or has in his or her control any firearm ... [i]f the person is free on bond or personal recognizance pending trial, appeal, or sentencing for a serious offense."); *see also Gun Laws: Prohibited Persons (Most Recent) By State,* StateMaster.com, http://www.statemaster.com/graph/gov_gun_law_pro-per-government-gun-laws-prohibited-persons# source (last visited Nov. 18, 2011) (describing restrictions on gun possession by state). This limitation is of comparatively recent vintage.

Prior to 1923, at least seven state legislatures had adopted bans on the carrying of concealed weapons by violent offenders. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*, 32 Harv. J.L. & Pub. Pol'y 695, 702, 707–09 (citing Handbook of the National Conference of Commissioners on Uniform State Laws and Proceedings of the Thirty–Fifth Annual Meeting 862–63 (1925)).

The first federal statute limiting the right of individuals under indictment to access firearms was enacted in 1938. Federal Firearms Act of 1938, 75 Cong. Ch. 850, § 2(e), 52 Stat. 1250, 1251 (repealed). It prohibited individuals under indictment for, or convicted of, a crime of violence from shipping or transporting any firearms or ammunition in interstate commerce. *Id.* It also proscribed possession of firearms by any fugitive from justice, *id.*, as well as by violent felons and misdemeanants. *Id.* § 2(f), 52 Stat. 1250, 1251. "Crimes of violence" were commonly understood to include only those offenses "ordinarily committed with the aid of firearms." Marshall, *supra,* at 702. As described by one court:

> The evils sought to be corrected by Congress through the Federal Firearms Act, 15 U.S.C.A. § 901 et seq., are well known—the practice of roaming racketeers and predatory criminals who know no state lines—a situation beyond the power of control by local authorities to such an extent as to constitute a national menace.

*United States v. Platt,* 31 F.Supp. 788, 790 (S.D.Tex.1940) (citing Record of Hearings on H.R. 9066 Before the House Committee on Ways and Means, 73d Congress). Congress enacted the statute in order to "eliminate the guns from the crooks' hands, while interfering as little as possible with the law-a-biding citizen." S.Rep. No. 82, 75th Cong., 1st Sess. 2 (1937). It thus "sought to protect the public by preventing the transportation and possession of firearms and ammunition by those who, by their past conduct, had demonstrated their unfitness to be entrusted with such dan-

gerous instrumentalities." *Cases v. United States,* 131 F.2d 916, 921 (1st Cir.1942).

In 1961, Congress expanded the prohibition of § 2(e) to encompass all individuals under indictment, regardless of the crime they were accused of. *See* Act of Oct. 3, 1961, Pub.L. No. 87–342, 75 Stat. 757 (repealed). The act was intended "[t]o strengthen the Federal Firearms Act," *id.,* and "make it more difficult for the criminal elements of our society to obtain firearms," S.Rep. No. 364, 87th Cong., 1st Sess. 2 (1961). Introduced at the request of the Attorney General, the legislation was an integral part of an anti-crime program. S.Rep. No. 364, 87th Cong., 1st Sess. 2 (1961). In recommending that § 2(e) and other portions of the Federal Firearms Act be amended, the House Ways and Means Committee reported that "the infiltration of racketeering into society and the exploding crime rate ha[d] increasingly become a cause for national concern." *United States v. Thoresen,* 428 F.2d 654, 659 (9th Cir.1970) (citing 2 U.S.Code Cong. and Admin. News, p. 3068, 87th Cong. 1st Sess. (1961)). New laws were needed "so the Federal Government can better assist local authorities in the common assault against crime." *Id.* (citing 2 U.S.Code Cong. and Admin. News, p. 3068, 87th Cong. 1st Sess. (1961)); *see also* S.Rep. No. 364, 87th Cong., 1st Sess. 2 (1961). Accordingly, Congress deleted the words "crime of violence" in §§ 2(d), (e), and (f) of the 1938 Act and inserted the words "crime punishable by imprisonment for a term exceeding one year." Act of Oct. 3, 1961, Pub.L. No. 87–342, § 2, 75 Stat. 757.

The scope of the statute was again expanded by the Gun Control Act of 1968. Pub.L. 90–618, 82 Stat. 1213 (codified at 18 U.S.C. § 921 *et seq.*). The 1968 Act clarified the definition of "indictment" to include an information or indictment in *any court*—state or federal—if the court had power to prosecute any crime punishable by more than one year in prison. *Id.* § 921(a)(14), 82 Stat. 1216 (defining indictment as "an indictment or information in *any* court under which a crime punishable by imprisonment for a term exceeding one year may be prosecuted" (emphasis added)). The statute was designed to require the indictment to be a felony, emphasizing the crime rather than the indicting court's jurisdiction. *See* S.Rep. No. 1501, 90th Cong., 2d Sess. (1968), *reprinted in* 1968 U.S.C.C.A.N. 2112, 2201 ("Inasmuch as a person under indictment for certain crimes is proscribed from shipping or receiving firearms in interstate or foreign commerce and a license will not be issued to such a person, the definition makes it clear that either *an indictment or an information in any court for a felony* comes within the meaning of the term." (emphasis added)). It criminalized receipt of a firearm or ammunition "by any person ... *who is under indictment for,* or who has been convicted in any court of, *a crime punishable by imprisonment for a term exceeding one year.*" Gun Control Act of 1968, Pub.L. 90–618, § 102, 82 Stat. 1219–20 (emphasis added). It also continued to criminalize the shipping or transportation of firearms or ammunition by an individual under indictment. *Id.* § 922(g)(1), 82 Stat. 1219.

As described by the Supreme Court:

[T]he 1968 Act reflects a ... concern with keeping firearms out of the hands of categories of potentially irresponsible persons, including convicted felons. Its broadly stated principal purpose was "to make it possible to keep firearms out of the hands of those not legally entitled to possess them because of age, criminal background, or incompetency." S.Rep. No. 1501, 90th Cong., 2d Sess., 22 (1968), 1968 U.S.C.C.A.N. 2112, 2113. See also 114 Cong. Rec. 13219 (1968) (remarks by Sen. Tydings); *Huddleston v. United States,* 415 U.S. [814] at 824–825, 94 S.Ct. 1262, 39 L.Ed.2d 782. . . .

*Barrett v. United States,* 423 U.S. 212, 220, 96 S.Ct. 498, 46 L.Ed.2d 450 (1976). The Act sought to combat violence and promote public safety. *See United States v. Pruner,* 606 F.2d 871, 874 (9th Cir.1979); *United States v. Haddad,* 558 F.2d 968, 972 (9th Cir.1977); *United States v. Turcotte,* 558 F.2d 893, 896 (8th Cir.1977). "[M]aximiz[ing] the possibility of keeping firearms out of the hands of [felons]" was the method used. *Pruner,* 606 F.2d at 874 (citing 114 Cong. Rec. 21784 (1968)). At the same time, Congress affirmed its intent not to interfere with "law-abiding citizens'" rights:

> [I]t is not the purpose of this title to place any undue or unnecessary Federal restrictions or burdens on law-abiding citizens with respect to the acquisition, possession, or use of firearms appropriate to the purpose of hunting, trapshooting, target shooting, personal protection, or any other lawful activity, and . . . this title is not intended to discourage or eliminate the private ownership or use of firearms by law-abiding citizens for lawful purposes.

S.Rep. No. 1501, 90th Cong., 2d Sess., 22 (1968), 1968 U.S.C.C.A.N. 2112, 2199.

In 1986, Congress again revised the statute to combine the provisions of § 922(g)(1) and (h)(1) that dealt with indictees into a single section, § 922(n). Firearms Owners' Protection Act, Pub.L. 99–308, 100 Stat 449 (1986). In passing the Act, Congress found that "the rights of citizens . . . to keep and bear arms under the second amendment to the United States Constitution; . . . and assurance of due process of law under the fifth amendment . . . require additional legislation to correct existing firearms statutes and enforcement policies." *Id.* § 1, 100 Stat 449. Congress also reaffirmed its intent not "to discourage or eliminate the private ownership or use of firearms by law-abiding citizens for lawful purposes." *Id.*

Subsequent amendments to the statute have not changed the language of § 922(n) or the content of its prohibitions.

### B. Current Statutory Text

18 U.S.C. § 922 imposes a wide range of restrictions on gun manufacture, transportation, sale, and possession. While it does not prohibit the transportation or receipt of guns generally, it regulates the transportation, receipt, or possession of guns by certain classes of individuals. Section 922(n) specifically prohibits the shipment, transportation, or receipt of firearms by "any person who is under indictment for a crime punishable by imprisonment for a term exceeding one year." 18 U.S.C. § 922(n). Under the statute, the fact that the defendant has been indicted for any felony converts the otherwise lawful act of transporting or receiving a gun into criminal conduct. It thus both limits the ability of indictees to access weapons and applies criminal sanctions to the exercise of that liberty. It does so categorically, without requiring an independent determination of dangerousness. It imposes significant penalties for this crime, including imprisonment of up to five years. 18 U.S.C. § 924(a)(1).

### C. Meaning of "Receive"

When viewed in the context of other provisions of 18 U.S.C. § 922, the words "ship," "transport," and "receive" in § 922(n) are used with precision. They contrast with specifications such as, e.g., "to ship or transport . . ., or possess . . .; or to receive," § 922(g); "to receive, possess, or transport," § 922(h)(1); "to receive, possess, conceal, store, barter, sell or dispose of," § 922(j); "to import," § 922(*l*); "and to transfer or possess," § 922(*o*)(1).

The word "receive" is defined principally as an action: "to take back, take, accept." Webster's Third New International Dictionary (1993); *see also, e.g.,* The Complete

Oxford English Dictionary (2d ed. 2002) ("To take in one's hand, or into one's possession (something held out or offered by another); to take delivery of (a thing) from another, either for oneself or for a third party."). By contrast, to "possess" is passive, defined primarily as "to have and hold as property." Webster's Third New International Dictionary (1993); *see also, e.g.,* The Complete Oxford English Dictionary (2d ed. 2002) ("To hold as property; to have belonging to one, as wealth or material objects; to own.").

In the present case, the contrast is between possession, which does not require a change in condition—possession could have started at any time, even before indictment for a felony—and "receipt," which requires a transfer of possession at a specific time, the taking.

By its own terms, § 922(n) does not prohibit *possession* of a weapon by someone under indictment, but only shipping, transportation, or *receipt.* The government urges that receipt can be proved by mere possession or constructive possession. *See* Tr. of Hr'g on Order to Show Cause, Nov. 21, 2011. This claim has no merit.

The government points to *United States v. Rivera,* in which the Court of Appeals for the Second Circuit held that evidence of constructive possession was sufficient to support a conviction under § 922(h)(1), an earlier version of § 922(n). 844 F.2d 916, 925 (2d Cir.1988). Section 922(h)(1) provided that:

> It shall be unlawful for any person … who is under indictment for, or has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year … *to receive* any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

Gun Control Act of 1968, Pub.L. 90–618, § 102, 82 Stat. 1219–20 (emphasis added).

The defendant Pedro Rivera stipulated that he was a convicted felon, and that the gun travelled in interstate commerce. Brief for Appellant Pedro Rivera at 7, *United States v. Rivera,* 844 F.2d 916 (2d Cir. 1988) (No. 87–1053). Because Rivera exercised dominion and control over the gun, the appellate court found that he had "received" it for purposes of § 922(h)(1). *Rivera,* 844 F.2d at 925.

The government argues that, because the language of § 922(h)(1) mirrors the current language of § 922(n), this court should adopt the Second Circuit's interpretation of receipt by a felon under § 922(h)(1) as the meaning of receipt by an indictee under § 922(n). *See* Tr. of Hr'g on Order to Show Cause, Nov. 21, 2011.

The Court of Appeals for the Second Circuit's holding in *Rivera* is inapposite.

First, because the defendant in *Rivera* conceded that possession was sufficient to establish receipt, the distinction between "receipt" and "possession" was never before the court. Brief for Appellant Pedro Rivera at 7, *United States v. Rivera,* 844 F.2d 916 (2d Cir.1988) (No. 87–1053) ("Obviously possession by a defendant would support an inference that he had 'received' it in violation of the statute" under the facts in *Rivera.*). Rivera instead argued that, as a factual matter, there was insufficient evidence that he was in possession of the gun. *Id.* at 8. The gun was found behind a panel in a hall closet of Rivera's apartment; he contended that it belonged to his son or another current or former occupant of the property, and that he, the defendant, never received or possessed it. *See id.* at 6–8. It is obvious from Rivera's argument that the court on appeal never had before it the issue posed in the present case: whether a defendant must receive a firearm *after* indictment. *See id. passim.*

Second, in recodifying the provisions of § 922(h)(1) relating to indictees in § 922(n), Congress intended not to criminalize mere possession of firearms. The defendant in *Rivera* was indicted in 1985 and convicted in May 1986. *See United States v. Rivera*, 634 F.Supp. 204 (S.D.N.Y.1986), *aff'd* 802 F.2d 593 (2d Cir. 1986); *Rivera v. United States*, No. 92–cv–7726, 1993 WL 464747, at *1 (S.D.N.Y. Nov. 12, 1993). Following Rivera's conviction—although before his appeal was completed—the provisions of the prior 18 U.S.C. § 922(h)(1) that pertained to felons, as well as other sections that limited access to guns by dangerous persons, were separated and recodified at 18 U.S.C. § 922(g). *See* Firearms Owners' Protection Act, Pub.L. 99–308, § 110, 100 Stat 449 (1986) (stating that the Act shall go into effect one hundred and eighty days following its passage on May 19, 1986). Although these amendments had gone into effect by the time the Court of Appeals for the Second Circuit heard the case, because Rivera challenged the sufficiency of the evidence justifying his conviction under the prior version of the statute, the appellate court applied and interpreted the earlier iteration. *See Rivera*, 844 F.2d at 924.

As described in Part III(A), *supra*, the 1986 amendments to § 922 were intended to provide further protection to "the rights of citizens ... to keep and bear arms under the second amendment to the United States Constitution; ... and assurance of due process of law under the fifth amendment...." *Id.* § 1.

As amended, section 922(g) specifically criminalizes gun *possession*, as well as transportation and receipt, by several categories of individuals, including convicted felons. 18 U.S.C. § 922(g) (stating that it shall be unlawful for particular categories of individuals to "to ship or transport in interstate or foreign commerce, *or possess in or affecting commerce*, any firearm or ammunition; *or to receive* any firearm or ammunition which has been shipped or transported in interstate or foreign commerce" (emphasis added)). Other subsections of the amended § 922 prohibit possession of certain kinds of firearms, or of firearms by certain individuals. *See, e.g.* 18 U.S.C. § 922(k) ("It shall be unlawful for any person knowingly to ... *possess* or receive any firearm which has had the importer's or manufacturer's serial number removed, obliterated, or altered and has, at any time, been shipped or transported in interstate or foreign commerce." (emphasis added)).

■ In the same 1986 act, the provisions of 18 U.S.C. § 922(h)(1) that pertained to individuals under indictment were recodified as 18 U.S.C. § 922(n). By omitting the word "possession" from § 922(n), Congress intended that "[p]ersons under indictment *are prohibited from receiving* or transporting firearms but *may continue to possess them.*" H.R.Rep. No. 495, 99th Cong., 2d Sess. (1986), *reprinted in* 1986 U.S.C.C.A.N. 1327, 1360; *see Keene Corp. v. United States*, 508 U.S. 200, 208, 113 S.Ct. 2035, 124 L.Ed.2d 118 (1993) ("[W]hen Congress includes particular language in one section of a statute but omits it in another ... it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.").

■ In recodifying the provisions of § 922(h)(1) so it pertained only to indictees as § 922(n), rather than as part of § 922(g), Congress evinced its decision *not* to criminalize mere possession of firearms by indictees. "[A]n indictment that alleges only possession of a firearm by a person under indictment is insufficient to charge a violation of 18 U.S.C. § 922(n)":

Even assuming that one who possesses a firearm necessarily received it first, receipt is a discrete occurrence while pos-

session implies a continuous act. A person who acquires a firearm and is later indicted continues to *possess* the firearm, but he does not *receive* the firearm again by virtue of that possession.

*United States v. Adams,* No. 11–cr–00046, 2011 WL 1475978, at *2 (S.D.Ala. April 18, 2011).

■ In order to prove the defendant guilty of violating § 922(n), the government must establish that he shipped, transported, or received the gun *after* and while still under an indictment for a crime punishable by a term of imprisonment exceeding one year. To interpret the statute otherwise would criminalize mere possession and would be contrary to the law as written and interpreted.

### D. Government Interest at Stake

The government's interest is of critical importance in evaluating the statute's constitutionality. Substantial legislative history indicates that § 922(n) is supported by a compelling government interest in public safety.

In its report on the Gun Control Act of 1968, the Senate found that "[t]he ready availability; that is, ease with which any person can anonymously acquire firearms (including criminals ... and others whose possession of firearms is similarly contrary to the public interest) is a matter of serious national concern." S.Rep. No. 1501, 90th Cong., 2d Sess., 1968 U.S.C.C.A.N. 2112, 2113 (1968). It was believed that crime and racketeering could be curtailed nationwide by limiting the ability of those whose past records demonstrated a propensity to engage in such activity from transporting or receiving weapons in interstate commerce.

■ "The federal gun control statute is designed to prohibit the ownership of firearms not only by individuals who have already committed dangerous acts, but also by those with a potential for violence as well." *United States v. Waters,* 23 F.3d 29, 34 (2d Cir.1994). Specifically, Congress concluded that individuals under indictment "have a somewhat greater likelihood than other citizens to misuse firearms." *United States v. Munsterman,* 177 F.3d 1139, 1142 (9th Cir.1999); *United States v. Graves,* 554 F.2d 65, 72 (3d Cir. 1977); *see also United States v. Weingartner,* 485 F.Supp. 1167, 1172 (D.N.J.1979) ("Congress could rationally conclude that persons indicted for non-trade regulation offenses punishable by a term of imprisonment exceeding one year have a significantly greater propensity for the misuse of firearms than the population as a whole.").

The Supreme Court has explained that "[t]he government's interest in preventing crime by arrestees is both legitimate and compelling." *United States v. Salerno,* 481 U.S. 739, 749, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987); *see also Schenck v. Pro—Choice Network,* 519 U.S. 357, 376, 117 S.Ct. 855, 137 L.Ed.2d 1 (1997) (referring to the "significant governmental interest in public safety"); *United States v. Skoien,* 614 F.3d 638, 642 (7th Cir.2010) ("[N]o one doubts that the goal of ... preventing armed mayhem, is an important governmental objective."). While this interest is heightened "when the Government musters convincing proof that the arrestee, already indicted or held to answer for a serious crime, presents a demonstrable danger to the community," *Salerno,* 481 U.S. at 750, 107 S.Ct. 2095, the absence of such an individual determination does not substantially dilute the interest.

Since the statute requires the defendant to know that he has been indicted and thereafter to knowingly received a gun, *see* Part V(C), *infra,* the government's interest is narrow and clear. It would take a particularly brazen and dangerous individual

to engage in a gun transaction while knowingly under a felony indictment.

### E. Prior Constitutional Challenges

The Supreme Court has not ruled on the constitutionality of 18 U.S.C. § 922(n) or its predecessor provisions. Several district courts and courts of appeals have found that the section does not violate the Commerce Clause, *e.g. United States v. Gaines*, 295 F.3d 293, 302 (2d Cir.2002); equal protection secured by the Fifth Amendment, *e.g. United States v. Craven*, 478 F.2d 1329 (6th Cir.1973); the presumption of innocence, *Thoresen*, 428 F.2d at 661; *United States v. Brown*, 484 F.2d 418, 424 (1973); *Craven*, 478 F.2d 1329; or the Second Amendment, *United States v. Rivero*, 218 Fed.Appx. 958, 958 (11th Cir. 2007). Although the Court of Appeals for the Second Circuit has noted in a stray reference that 18 U.S.C. § 922(n) "prohibit[s] the possession of firearms by individuals under indictment, even though they are presumed innocent under the law," *Waters*, 23 F.3d at 34, it has not ruled on the constitutionality of the statute outside the context of the Commerce Clause, *see Gaines*, 295 F.3d at 302. Apparently no court has ruled on a constitutional challenge to § 922(n) since *District of Columbia v. Heller*, 554 U.S. 570, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008) held that the Second Amendment protects an individual right to bear arms.

## IV. Background

In order to understand the nature of the deprivation accomplished by the statute, some background on the grand jury and the rights of individuals under indictment is necessary.

### A. Power of the Grand Jury

■ An indictment is not a finding of guilt beyond a reasonable doubt, nor even by a preponderance of the evidence. It requires only two things: 1) that a prosecutor seek an indictment; and 2) that a grand jury conclude that there is probable cause to believe that the defendant is guilty of the charged crime. The grand jury need not consider either exculpatory evidence or the defendant's version of events.

■ Federal grand jury proceedings are not limited by the procedural protections guaranteed to defendants at trial. *Costello v. United States*, 350 U.S. 359, 362, 76 S.Ct. 406, 100 L.Ed. 397 (1956) ("[N]either the Fifth Amendment nor any other constitutional provision prescribes the kind of evidence upon which grand juries must act."). As the Supreme Court has noted, "the whole history of the grand jury institution" is one "in which laymen conduct their inquiries unfettered by technical rules." *Id.* at 364, 76 S.Ct. 406.

Traditionally the grand jury has been accorded wide latitude to inquire into violations of criminal law. No judge presides to monitor its proceedings. It deliberates in secret and may determine alone the course of its inquiry. The grand jury may compel the production of evidence or the testimony of witnesses as it considers appropriate, and its operation generally is unrestrained by the technical procedural and evidentiary rules governing the conduct of criminal trials. "It is a grand inquest, a body with powers of investigation and inquisition, the scope of whose inquiries is not to be limited narrowly by questions of propriety or forecasts of the probable result of the investigation, or by doubts whether any particular individual will be found properly subject to an accusation of crime." *Blair v. United States*, 250 U.S. 273, 282, 39 S.Ct. 468, 63 L.Ed. 979 (1919).

*United States v. Calandra*, 414 U.S. 338, 343, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974).

■ Federal grand juries have enormous power to consider a wide range of

evidence, regardless of whether that evidence is reliable or would be admissible at trial. They may consider hearsay. *Costello*, 350 U.S. at 363, 76 S.Ct. 406. They may hear evidence that would ordinarily be barred by the Fourth Amendment's exclusionary rule. *Calandra*, 414 U.S. at 354, 94 S.Ct. 613. They may rely on evidence obtained in violation of a defendant's Fifth Amendment privilege against self-incrimination. *Lawn v. United States*, 355 U.S. 339, 78 S.Ct. 311, 2 L.Ed.2d 321 (1958).

■ A defendant has a limited ability to inquire into the propriety of a grand jury's determinations, even if that determination is based on incompetent, irrelevant, or unconstitutionally-obtained evidence. *See Costello*, 350 U.S. at 364, 76 S.Ct. 406 (refusing to establish a rule that would permit defendants to challenge indictments on the ground that they are not supported by adequate or competent evidence); *cf. Blair*, 250 U.S. at 282, 39 S.Ct. 468 (stating that a witness in a grand jury proceeding "is not entitled to urge objections of incompetency or irrelevancy, such as a party might raise, for this is no concern of his"); *Holt v. United States*, 218 U.S. 245, 31 S.Ct. 2, 54 L.Ed. 1021 (1910) (refusing to quash an indictment although "there was very little evidence against the accused" and some of the available evidence was incompetent). Defense attorneys are not allowed in the grand jury room. Transcripts are rarely made available.

Some state grand juries may provide some additional procedural protections. John F. Decker, *Legislating the New Federalism: Grand Jury Reform in the States*, 58 Okla. L.Rev. 341, 369–70 (2005) ("[A]t least twenty-four state legislatures have created a statutory right to counsel in conjunction with the grand jury."); *id.* at 373–74 (noting that several states require prosecutors, either by statute or case law, to present exculpatory evidence to the grand jury); *id.* at 380 (stating that five states recognize that the target of a proceeding has a right to appear before the grand jury, at least in some instances). Even so, these protections fall far below those a defendant is entitled to at trial. *Id.* at 370–71("In most states that have established a statutory right to counsel [in the grand jury], this right is limited to counsel privately retained; only seven states require the appointment of counsel to targets, subjects, or witnesses.... Virtually all the state laws permitting counsel to be present in the grand jury room include language strictly limiting the attorney's participation in the proceedings."); *id.* at 375 ("Cases in which an indictment was dismissed for failure to present exculpatory evidence generally involve egregious problems with the prosecutor's presentation of the evidence to the grand jury."); *id.* at 376 ("Many state courts ... are reluctant to limit the grand jury's investigative powers and to permit judicial inquiries into the quality of evidence presented to the grand jury.").

The great power and discretion vested in the grand jury reduces delay. *See Costello*, 350 U.S. at 363–64, 76 S.Ct. 406. "In some cases the delay might be fatal to the enforcement of the criminal law." *Calandra*, 414 U.S. at 349, 94 S.Ct. 613. It also brings with it the potential for mistake and abuse.

"[M]any lawyers and judges have expressed skepticism concerning the power of the Grand Jury." *United States v. Navarro–Vargas*, 408 F.3d 1184, 1195 (9th Cir.2005) (en banc). These qualms were summarized by the Chief Judge of New York when he publicly stated that a grand jury would indict a "ham sandwich" if asked to do so by the prosecutor. *Id.* (citing *In re Grand Jury Subpoena of Stewart*, 144 Misc.2d 1012, 545 N.Y.S.2d 974, 977 n. 1 (N.Y.Cnty.Sup.Ct.1989), *aff'd*

*as modified*, 156 A.D.2d 294, 548 N.Y.S.2d 679 (1st Dep't 1989)). While "the modern grand jury technically remains an independent body ... as a practical matter, it relies heavily on the prosecutor to secure evidence and give the jurors legal advice." John Decker, *Legislating New Federalism: The Call for Grand Jury Reform in the States*, 58 Okla. L.Rev. 341 (2005). Federal grand juries indict in almost all cases brought by prosecutors. *Navarro–Vargas*, 408 F.3d at 1195 (citing Federal Justice Statistics Database, Federal Justice Statistics Resource Center, http://fjsrc.urban.org (last visited January 5, 2005) (noting that federal grand juries returned only twenty-one no-bills in 2001)). Many criticize the modern grand jury as no more than a "rubber stamp" for the prosecutor. 1 Sara Sun Beale, et al., Grand Jury Law and Practice § 1:1 (2d ed. 2001); Marvin E. Frankel & Gary Naftalis, The Grand Jury: An Institution on Trial 22 (2d ed. 1977) ("Day in and day out, the grand jury affirms what the prosecutor calls upon it to affirm—investigating as it is led, ignoring what it is never advised to notice, failing to indict or indicting as the prosecutor 'submits' that it should."); Roger Roots, *Grand Juries Gone Wrong*, 14 Rich. J.L. & Pub. Int. 331, 331–32 (2010) ("The ongoing national disgrace that is contemporary federal grand jury practice has attracted the attention of scholars for several decades. Today's federal grand juries fail to provide even a modicum of resistance to the government, and serve as a machine of government expansion and caprice. Instead of obstructing and opposing the powerlust of government prosecutors, contemporary grand juries provide their government captors with cover for misconduct and perjury on a massive scale and a means to abuse, threaten and intimidate the American people."); Fred A. Bernstein, *Behind the Gray Door: Williams, Secrecy, and the Federal Grand Jury*, 69 N.Y.U. L. Rev. 563, 569 n.

31(1994) (It is "almost always easier to get an indictment [from a grand jury] than to satisfy a judge that there is probable cause."); Peter Arenella, *Reforming the Federal Grand Jury and the State Preliminary Hearing to Prevent Conviction Without Adjudication*, 78 Mich. L.Rev. 463, 474 (1980) (noting "the grand jury's tendency to rubberstamp the prosecutor's decisions"); William J. Campbell, *Eliminate the Grand Jury*, 64 J.Crim. L. & Criminology 174, 174 (1973) (noting that "the grand jury is the total captive of the prosecutor who, if he is candid will concede that he can indict anybody at any time, for almost anything, before any grand jury").

Because of the ease of indictment, courts have been troubled by the possibility that individuals may suffer the collateral consequences of an indictment that is unfounded. *See, e.g., United States v. Serubo*, 604 F.2d 807, 817 (3d Cir.1979) ("[W]hile in theory a trial provides a defendant with a full opportunity to contest and disprove the charges against him, in practice, the handing up of an indictment will often have a devastating personal and professional impact that a later dismissal or acquittal can never undo."); *In re Fried*, 161 F.2d 453, 458 (2d Cir.1947) ("[A] wrongful indictment is no laughing matter; often it works a grievous, irreparable injury to the person indicted. The stigma cannot easily be erased. In the public mind, the blot on a man's escutcheon, resulting from such a public accusation of wrongdoing, is seldom wiped out by a subsequent judgment of not guilty. Frequently, the public remembers the accusation, and still suspects guilt, even after an acquittal.").

### B. Rights of Individuals Under Arpest or Indictment

While an indictee is presumed innocent, *see* Part V(D), *infra*, an indictment "is not without [adverse] legal consequences."

It establishes that there is probable cause to believe that an offense was committed, and that the defendant committed it. Upon probable cause a warrant for the defendant's arrest may issue; a period of administrative detention may occur before the evidence of probable cause is presented to a neutral magistrate.... Once a defendant has been committed for trial he may be detained in custody if the magistrate finds that no conditions of release will prevent him from becoming a fugitive.

*United States v. Salerno*, 481 U.S. 739, 764, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987) (Marshall, J., dissenting).

Indictment has historically had a limited effect on an individual's constitutional rights. Probably the most important consequence is the potential for pre-trial detention. *See* Bail Reform Act of 1984, 18 U.S.C. § 3141 *et seq.*; *Salerno*, 481 U.S. 739, 107 S.Ct. 2095. This deprivation of liberty is accompanied by substantial procedural protections. In the federal system, for example, defendants are arraigned before a judge or magistrate judge after indictment. At this hearing, the official has the power to remand the defendant to federal custody; to release the defendant on his own recognizance; or to set bail. *See* 18 U.S.C. § 3141(a) (requiring a judicial officer to determine whether an arrestee shall be detained). The defendant may request the presence of counsel at the detention hearing; testify and present witnesses in his behalf; proffer evidence; and cross-examine other witnesses appearing at the hearing. 18 U.S.C. § 3142(f). Pre-trial detention may be ordered only "[i]f, after a hearing ..., the judicial officer finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community," 18 U.S.C. § 3142(e), based on "clear and convincing evidence," 18 U.S.C. § 3142(f). The court

must consider the nature and seriousness of the charges, the substantiality of the government's evidence against the arrestee, the arrestee's background and characteristics, and the nature and seriousness of the danger posed by the suspect's release. 18 U.S.C. § 3142(g). Such procedural protections are necessary to avoid infringing on the rights of defendants pre-trial.

In *Salerno*, the Supreme Court upheld the ability of a federal court to detain an arrestee before trial on a finding by "clear and convincing" evidence that detention is the only way to reasonably insure the safety of the community. *Salerno*, 481 U.S. at 741, 107 S.Ct. 2095. The provision withstood constitutional scrutiny because it included procedural protections. The Court declared:

> [T]he Government must first of all demonstrate probable cause to believe that the charged crime has been committed by the arrestee, *but that is not enough.* In a full-blown adversary hearing, the Government must convince a neutral decisionmaker by clear and convincing evidence that no conditions of release can reasonably assure the safety of the community or any person....

*Id.* at 751–52, 107 S.Ct. 2095 (internal citations omitted) (emphasis added).

 An indictee may also be subject to pre-trial release conditions that infringe upon his constitutional rights, provided that there has been an independent judicial determination that such conditions are necessary. *Compare, e.g.,* 18 U.S.C. § 3142(c)(1)(B)(xiv) ("If the judicial officer determines that the release described in subsection (b) of this section will not reasonably assure the appearance of the person as required or will endanger the safety of any other person or the community, such judicial officer shall order the pretrial release of the person ... subject to the least restrictive further condition, or com-

bination of conditions, that such judicial officer determines will reasonably assure the appearance of the person as required and the safety of any other person and the community, which may include the condition that the person ... satisfy any other condition that is reasonably necessary to assure the appearance of the person as required and to assure the safety of any other person and the community."); *and Berry v. District of Columbia,* 833 F.2d 1031, 1036 (D.C.Cir.1987) (stating that drug testing and treatment as a condition of pre-trial release would likely be constitutional if "there is an individualized determination that an arrestee will use drugs while released pending trial"); *with United States v. Scott,* 450 F.3d 863, 874 (9th Cir.2006) (holding that a pretrial release condition imposed under state law requiring that the defendant consent to random drug testing and the searching of the defendant's home violated the Fourth Amendment in the absence of any judicial determination that such condition was necessary); *United States v. Polouizzi,* 697 F.Supp.2d 381, 394–95 (E.D.N.Y.2010) (holding that the Adam Walsh Child Protection and Safety Act of 2006's requirement that individuals under arrest for child pornography charges be required to undergo electronic monitoring as a condition of pre-trial release unconstitutional); *United States v. Smedley,* 611 F.Supp.2d 971, 976 (E.D.Mo.2009) (same); *United States v. Merritt,* 612 F.Supp.2d 1074, 1079 (D.Neb.2009) (holding that requirement of electronic monitoring and imposing a curfew as a condition of pre-trial release unconstitutional); *United States v. Torres,* 566 F.Supp.2d 591, 598 (W.D.Tex.2008) (same); *United States v. Arzberger,* 592 F.Supp.2d 590, 607 (S.D.N.Y.2008) (striking down the Adam Walsh amendment's curfew and electronic monitoring requirements; restrictions on firearms possession; and restrictions on associating with witnesses); *United States v. Crowell,* Nos. 06–M–1095, 06–CR–291, 06–CR–304, 2006 WL 3541736, at *10 (W.D.N.Y. Dec. 7, 2006) (holding the Adam Walsh amendment's mandatory imposition of pretrial release conditions unconstitutional).

Arrest can sometimes trigger other collateral consequences such as loss of public housing or employment. *See, e.g.,* 24 C.F.R. § 966.4(1)5(iii)(A) (stating that in conventional public housing, a Public Housing Authority may terminate assistance "regardless of whether the covered person has been arrested or convicted for such activity and without satisfying the standard of proof used for a criminal conviction"); 24 C.F.R. § 982.553(c) (describing an analogous provision for Section 8 vouchers); K. Babe Howell, *Broken Lives from Broken Windows: The Hidden Costs of Aggressive Order Maintenance Policing,* 33 N.Y.U. Rev. L. & Soc. Change 271, 304–05 (2009) (describing the effects of arrest on employment). These deprivations may occur without significant procedural protections. *See* 42 U.S.C. 1437d(k) (stating that tenants must be given an opportunity to contest a termination of tenancy through the public housing authority's grievance procedure); 24 C.F.R. § 966.51(a)(2) (excluding evictions based on certain types of tenant criminal activity from the grievance requirement, including evictions for drug-related criminal activity on or near the premises or criminal activity that threatens the health, safety, or peaceful enjoyment of the premises of other tenants).

Generally, indictees are deprived of their constitutional rights only following an individual determination of need by a judge. Convicted felons, by contrast, are often subject to categorical deprivations of constitutional rights. *See, e.g., McKune v. Lile,* 536 U.S. 24, 38, 122 S.Ct. 2017, 153 L.Ed.2d 47 (2002) ("[L]awful conviction and incarceration necessarily place limita-

tions on the exercise of a defendant's privilege against self-incrimination."); *Jones v. Helms*, 452 U.S. 412, 419, 101 S.Ct. 2434, 69 L.Ed.2d 118 (1981) (upholding restrictions on a felon's fundamental right to travel); *Richardson v. Ramirez*, 418 U.S. 24, 54–56, 94 S.Ct. 2655, 41 L.Ed.2d 551 (1974) (upholding a state law disenfranchising felons on the basis of criminal conviction). Such deprivations may be justified, in part, because the factfinder has already made an individual determination of guilt beyond a reasonable doubt, removing the presumption of innocence and the protection it provides.

## C. Treatment of Unconvicted Conduct

Reliance on unconvicted conduct—i.e., activities that have not been proven beyond a reasonable doubt—to sanction defendants is constitutionally suspect. *See, e.g., Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) ("Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."); *but see Almendarez–Torres v. United States*, 523 U.S. 224, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998) (holding that defendant could be sentenced above the maximum for the offense alleged in the indictment; because he admitted to unconvicted conduct during his plea allocution, no question concerning the right to a jury trial or the standard of proof that would apply to a contested issue of fact was before the Court). The government cannot circumvent the protections of the Due Process Clause merely by "redefin[ing] the elements that constitute different crimes, characterizing them as factors that bear solely on the extent of punishment." *Mullaney v. Wilbur*, 421 U.S. 684, 698, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975).

## V. Constitutionality of 18 U.S.C. § 922(n)

### A. Facial vs. As Applied Challenges

■ "To successfully challenge a statute on its face, the challenger must show that no set of circumstances exists under which the Act would be valid." *Ohio v. Akron Ctr. for Reproductive Health*, 497 U.S. 502, 514, 110 S.Ct. 2972, 111 L.Ed.2d 405 (1990); *see also United States v. Salerno*, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987) ("A facial challenge to a legislative Act is ... the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid."); *see Diaz v. Paterson*, 547 F.3d 88, 101 (2d Cir.2008) (applying *Salerno* standard in evaluating facial constitutional challenge). *But see Washington v. Glucksberg*, 521 U.S. 702, 739–40, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997) (Stevens, J., concurring) (observing that the standard for assessing facial challenges has been the subject of debate in the Supreme Court).

In an as-applied challenge, the question is whether the statute would be unconstitutional if applied to the facts of the case. *Cf. Field Day LLC v. County of Suffolk*, 463 F.3d 167, 174 (2d Cir.2006). Factual context and defendant's circumstances are critical. *See, e.g., Arzberger*, 592 F.Supp.2d at 599. A sequential analysis, putting off facial challenges, permits the courts to protect the constitutional rights of individual defendants in particular situations, while avoiding the unnecessary striking down of a congressional enactment. *See Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 450, 128 S.Ct. 1184, 170 L.Ed.2d 151 (2008) (noting that facial invalidation contravenes the "fundamental principle ... that courts ... should [not] formulate a rule of consti-

tutional law broader than is required by the precise facts to which it is applied").

The defendant challenges the statute on its face. Def.'s Mem. of L. in Supp. of Mot. to Dismiss 2–3, Doc. 46, Nov. 17, 2011. He also argues that the fact that he may plead guilty to a misdemeanor may ultimately render it unconstitutional as applied to him. *See* Tr. of Hr'g on Order to Show Cause, Nov. 21, 2011.

## B. Commerce Clause

The Court of Appeals for the Second Circuit has held that the conduct proscribed by 18 U.S.C. § 922 has a sufficient nexus with interstate commerce and does not violate the Commerce Clause. *E.g., United States v. Gaines,* 295 F.3d 293, 302 (2d Cir.2002). Any Commerce Clause challenge is without merit.

■ Alternatively, defendant argues unpersuasively that § 922(n) should be read to require the government to prove that the firearm he received *traveled in interstate or foreign commerce after the indictment.* Def.'s Letter, Doc. Entry 51, Nov. 20, 2011. Defendant points to dicta in *United States v. Bass:*

> Title IV, 18 U.S.C. s 922(g) and (h), is a modified and recodified version of 15 U.S.C. s 902(e) and (f) (1964 ed.), 75 Stat. 757, which in turn amended the original statute passed in 1938, 52 Stat. 1250, 1251.... The wording of the substantive offense has remained identical, although the original Act had a provision that possession of a firearm 'shall be presumptive evidence that such firearm or ammunition was shipped or transported or received (in interstate or foreign commerce).' That presumption was struck down in *Tot v. United States,* 319 U.S. 463, 63 S.Ct. 1241, 87 L.Ed. 1519 (1943), and the Court there noted: "(T)he Act is confined to the receipt of firearms or ammunition as a part of interstate transportation and does not extend to the receipt, in an intrastate

> transaction, of such articles which, at some prior time, have been transported interstate." *Id.,* at 466, 63 S.Ct., at 1244.

404 U.S. 336, 343 & n. 10, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971). The Court noted, however, that "the reach of Title IV itself is a question to be decided finally some other day." *Id.*

Such a cramped reading of the statute is inappropriate. Under that interpretation, an indictee could buy a firearm after indictment at a local gun store—or use a straw purchaser to do so—without running afoul of the statute. It would render § 922(n) toothless.

## C. Fifth Amendment Notice Requirement

■ Concerns that § 922(n) may violate the Fifth Amendment's notice requirement, *see* Ct.'s Order, Doc. Entry 34, Oct. 18, 2011, are unfounded. Although the statute does not specifically state that a defendant must know that he is under a felony indictment, courts will imply such a requirement.

■ In order to be convicted under 18 U.S.C. § 922(n), the defendant must "willfully" commit a violation of the statute. *See* 18 U.S.C. § 924(a)(1)(D) ("Except as otherwise provided in this subsection, subsection (b), (c), (f), or (p) of this section, or in section 929, whoever ... willfully violates any other provision of this chapter, shall be fined under this title, imprisoned not more than five years, or both."); *Dixon v. United States,* 548 U.S. 1, 126 S.Ct. 2437, 165 L.Ed.2d 299 (2006). Conduct is "willful" under § 924(a)(1)(D) if the defendant to has "acted with an evil-meaning mind, that is to say, that he acted with knowledge that his conduct was unlawful." *Bryan v. United States,* 524 U.S. 184, 193, 118 S.Ct. 1939, 141 L.Ed.2d 197 (1998).

The statute does not, on its face, require that the defendant know that he was indicted in order to be convicted under the statute. While the Court of Appeals for the Second Circuit has not ruled on whether such knowledge is required, other courts of appeals have held that the government must prove that the defendant knew that he was under indictment. *United States v. Forbes*, 64 F.3d 928, 932–34 (4th Cir.1995) ("In the eyes of the law ..., buying an assault weapon is innocent behavior.... The defendant must have knowledge of the fact or facts that convert this innocent act into a crime. Here, that fact is the existence of a pending indictment."); *United States v. Hayden*, 64 F.3d 126, 133 (3d Cir.1995) ("[I]f a defendant knows he has been indicted or deliberately avoids ascertaining his status, and thereafter purchases a firearm, he will have satisfied the knowledge requirement of § 922(n)."); *United States v. Ballentine*, 4 F.3d 504, 506 (7th Cir.1993) ("Because there is a possibility that an indictment will remain sealed, a knowledge requirement would appear to be necessary to address the circumstance of a defendant's receiving a firearm while subject to an undisclosed sealed indictment. Without such a requirement, there could be unintended strict liability."), *cert. denied*, 510 U.S. 1179, 114 S.Ct. 1222, 127 L.Ed.2d 568 (1994); *United States v. Renner*, 496 F.2d 922, 926 (6th Cir.1974) (requiring that defendant know that he is under indictment because "special circumstances that may surround one under indictment, i.e., he may not be aware of the fact that he has been indicted because of failure to serve him on a secret indictment"); *cf. United States v. Chambers*, 922 F.2d 228, 241 (5th Cir.1991) ("[T]he requirement that the jury find that Chambers had knowledge of the existence of the indictment at the time he purchased the firearm and signed the form was clearly stated in the jury charge."). At least one court has stated that the defendant need not know that the crime for which he is indicted is punishable by a year or more of incarceration. *Hayden*, 64 F.3d at 133 n. 12.

A defendant must have knowledge of the fact that he is under indictment. As so interpreted, the Fifth Amendment's notice requirement is satisfied.

### D. Presumption of Innocence

■ Individuals have the fundamental right to be free from punishment unless and until the underlying conduct has been proven beyond a reasonable doubt at a jury trial. *See* U.S. Const. amend. V, XIV; *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) (holding that due process protects the right to have every element of the offense proved beyond a reasonable doubt to a jury). Although not specifically mentioned in the Constitution, an important component of this right is the presumption of innocence. *Estelle v. Williams*, 425 U.S. 501, 503, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976); *see also United States v. Jackson*, 368 F.3d 59, 65 (2d Cir.2004) ("[T]he Supreme Court made clear that the presumption of innocence and the requirement of proof beyond a reasonable doubt ... are imbedded in the Fifth Amendment's command that 'no person shall ... be deprived of ... liberty ... without due process of law.' ").

■ "The principle that there is a presumption of innocence in favor of the accused is the undoubted law, axiomatic and elementary, and its enforcement lies at the foundation of the administration of our criminal law." *Coffin v. United States*, 156 U.S. 432, 453, 15 S.Ct. 394, 39 L.Ed. 481 (1895). The doctrine "allocates the burden of proof in criminal trials" and "serve[s] as an admonishment to the jury to judge an accused's guilt or innocence solely on the evidence adduced at trial and not on the basis of suspicions that may arise from the fact of his arrest, indict-

ment, or custody, or from other matters not introduced as proof at trial." *Bell v. Wolfish*, 441 U.S. 520, 533, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); *see also In re Winship*, 397 U.S. 358, 362, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) ("The [reasonable doubt] standard provides concrete substance for the presumption of innocence-that bedrock 'axiomatic and elementary' principle whose 'enforcement lies at the foundation of the administration of our criminal law.' "). The prosecution thus "bears the burden of proving all elements of the offense charged and must persuade the fact finder beyond a reasonable doubt of the facts necessary to establish each of those elements." *Sullivan v. Louisiana*, 508 U.S. 275, 277–78, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993) (internal citations and quotations omitted).

■ Within the context of a criminal trial, the presumption of innocence affords the accused broad protections. In *Estelle v. Williams*, for example, the Supreme Court held that the accused may not be brought before the jury in prison attire. 425 U.S. at 504–05, 96 S.Ct. 1691. The Court found that "the constant reminder of the accused's condition implicit in such distinctive, identifiable attire may affect a juror's judgment. The defendant's clothing is so likely to be a continuing influence throughout the trial that . . . an unacceptable risk is presented of impermissible factors coming into play." *Id.* *But see Illinois v. Allen*, 397 U.S. 337, 344, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970) (recognizing that "the sight of shackles and gags might have a significant effect on the jury's feelings about the defendant," but upholding the practice when necessary to control a persistently disorderly defendant).

■ Outside the context of a criminal trial, the presumption of innocence has limited application. It does not prohibit the state from restricting the rights of arrestees who are detained while awaiting trial. In *Bell v. Wolfish*, the Court of Appeals for the Second Circuit relied on the presumption in crafting a stringent test for whether conditions of confinement violated the rights of pretrial detainees. *Bell*, 441 U.S. at 533, 99 S.Ct. 1861. The Supreme Court rejected both the test and its reasoning, finding that the presumption of innocence "has no application to a determination of the rights of a pre-trial detainee during confinement before his trial has even begun." *Id.* The presumption also does not continue once a jury has determined that the defendant is guilty. *Herrera v. Collins*, 506 U.S. 390, 399, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993) ("Once a defendant has been afforded a fair trial and convicted of the offense for which he was charged, the presumption of innocence disappears."). In both cases, the Court found that the presumption did not protect a defendant's constitutional rights where there had been some kind of independent judicial determination, either of the need for detention or of guilt.

■ Given the narrow scope of the right outside of trial, the instant statute does not violate the presumption of innocence. *Thoresen*, 428 F.2d at 661; *Craven*, 478 F.2d at 1340; *United States v. Brown*, 484 F.2d 418, 424 (5th Cir.1973); *United States v. Friday*, 404 F.Supp. 1343, 1345 (E.D.Mich.1975). As the Ninth Circuit has explained:

> It does not authorize a fact finder at the criminal trial to infer guilt . . . from the existence of a prior indictment or even to discount the credibility of a witness because of such an indictment. . . . It represents nothing more than a . . . Congressional finding that persons under indictment . . . may have a propensity for misusing firearms.

*Thoresen*, 428 F.2d at 661. The government is still required to prove every element of the offense beyond a reasonable

doubt. The fact that an individual is under indictment is another element of the offense to be proved; it may raise equal protection concerns, but not due process concerns. *Thoresen*, 428 F.2d at 661 ("Whether such Congressional finding results in an unreasonable classification contrary to equal protection principles is a separate question...."). The indictment raises a warning flag: the defendant may be dangerous, requiring temporary incarceration and forced sequestration from firearms.

■ While the presumption of innocence is not violated by the instant statute, it does lend color to claims concerning the effect of the statute on other rights of individuals under indictment.

> The assumption that [a defendant is] more likely to commit crimes than other members of the public, without an individualized determination to that effect, is contradicted by the presumption of innocence. That an individual is charged with a crime cannot, as a constitutional matter, give rise to any inference that he is more likely than any other citizen to commit a crime if he is released from custody. Defendant is, after all, *constitutionally presumed to be innocent* pending trial, and innocence *can only raise an inference of innocence, not guilt.*

*United States v. Scott*, 450 F.3d 863, 874 (9th Cir.2006) (emphasis added). *But see Thornton v. United States*, 541 U.S. 615, 630, 124 S.Ct. 2127, 158 L.Ed.2d 905 (2004) (Scalia, J., concurring) ("The fact of prior lawful arrest distinguishes the arrestee from society at large."). From a normative perspective, individuals under indictment are considered innocent under the law, just as other members of the general public. Indictees must be treated as far as is practicable in a manner similar to the general public.

The presumption itself is not a sufficient ground to declare the statute unconstitutional.

**E. Second Amendment**

The limits of the Second Amendment right to bear arms following *District of Columbia v. Heller*, 554 U.S. 570, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008), are unsettled. The scope of the right, as well as the kind of scrutiny to be applied, is unclear.

In evaluating the constitutionality of a statute under the Second Amendment since *Heller*, several courts of appeals have applied a two prong test. First, they have asked whether the prohibited act imposes a substantial burden on the right to bear arms for the purpose of self-defense in the home. Only those acts that impose such a burden merit heightened scrutiny—either strict or intermediate. Second, they have evaluated whether the statute survives that scrutiny. *United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir.2010); *United States v. Reese*, 627 F.3d 792, 800 (10th Cir.2010); *see generally Nordyke v. King*, 644 F.3d 776 (9th Cir.2011), *reh'g* en banc *granted* 664 F.3d 774 (9th Cir.2011).

Some courts have analogized the Second Amendment to the First, drawing on free speech jurisprudence to define what constitutes a substantial burden and the level of scrutiny necessary. *See, e.g., Marzzarella*, 614 F.3d at 96. Most courts have applied intermediate, rather than strict, scrutiny to laws that restrict access to guns by dangerous categories of individuals such as felons. *United States v. Masciandaro*, 638 F.3d 458, 469–70 (4th Cir. 2011), *cert. denied*, —— U.S. ——, 132 S.Ct. 756, 181 L.Ed.2d 482 (U.S.2011); *United States v. Chester*, 628 F.3d 673, 680–83 (4th Cir.2010); *Marzzarella*, 614 F.3d at 89; *United States v. Reese*, 627 F.3d 792, 800–01 (10th Cir.2010). To place gun rights on the same high protected level as speech rights seems an odd view of

American democratic values. While intermediate scrutiny seems excessive, the majority of courts have applied it, and it is satisfied by the instant facts and statute. Both on its face and as applied to the defendant in this case, § 922(n) survives that scrutiny.

### 1. Kinds of Constitutional Scrutiny

In construing constitutional limits, there are generally three levels of scrutiny. "At a minimum, a statutory classification must be rationally related to a legitimate governmental purpose"—so-called rational basis scrutiny. *Clark v. Jeter*, 486 U.S. 456, 461, 108 S.Ct. 1910, 100 L.Ed.2d 465 (1988) (citations omitted); *see also F.C.C. v. Beach Communications, Inc.*, 508 U.S. 307, 313, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993) ("In areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification."); *Hayden v. Paterson*, 594 F.3d 150, 169–70 (2d Cir.2010). At the other end of the spectrum, strict scrutiny covers state "classifications based on race or national origin and classifications affecting fundamental rights." *Clark*, 486 U.S. at 461, 108 S.Ct. 1910 (citations omitted). It also applies to government restrictions on the content of protected speech, *Brown v. Entertainment Merchants Ass'n*, —— U.S. ——, 131 S.Ct. 2729, 2738, 180 L.Ed.2d 708 (2011), particularly political speech, *Citizens United v. Fed. Election Com'n*, 558 U.S. 310, 130 S.Ct. 876, 898, 175 L.Ed.2d 753 (2010), and on the speech of disfavored speakers, *Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622, 658, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994). In order to survive strict scrutiny, the challenged statute must be narrowly tailored to achieve a compelling government interest. E.g., *Citizens United*, 130 S.Ct. at 898; *Parents Involved in Community Schools v. Seattle School Dist. No. 1*, 551 U.S. 701, 720, 127 S.Ct. 2738, 168 L.Ed.2d 508 (2007). "Between these extremes of rational basis review and strict scrutiny lies a level of intermediate scrutiny." *Clark*, 486 U.S. at 461, 108 S.Ct. 1910 (citations omitted). Intermediate scrutiny applies to content-neutral restrictions that place an incidental burden on speech, *see, e.g., Turner Broadcasting System, Inc.*, 512 U.S. at 662, 114 S.Ct. 2445; to disabilities premised on illegitimacy, *see, e.g., Mills v. Habluetzel*, 456 U.S. 91, 98–99, 102 S.Ct. 1549, 71 L.Ed.2d 770 (1982); and to discrimination on the basis of sex, *see, e.g., Craig v. Boren*, 429 U.S. 190, 197, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976). As discussed in detail in Part V(E)(4), intermediate scrutiny is appropriate in this case.

Intermediate scrutiny has been formulated in a number of ways, all requiring some form of serious government interest and a substantial connection between furthering that interest and the limit on the constitutional right. *See United States v. O'Brien*, 391 U.S. 367, 376–77, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968) ("To characterize the quality of the governmental interest which must appear, the Court has employed a variety of descriptive terms: compelling; substantial; subordinating; paramount; cogent; strong."). *Compare Clark*, 486 U.S. at 461, 108 S.Ct. 1910 ("To withstand intermediate scrutiny, a statutory classification must be substantially related to an important governmental objective."); *with O'Brien*, 391 U.S. at 377, 88 S.Ct. 1673 ("[A] government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the

furtherance of that interest."); *and Chester*, 628 F.3d at 683 (holding that there must be a " 'reasonable fit' between the challenged regulation and a 'substantial' government objective").

 The degree to which the statute must be tailored to the state interest is uncertain. In the equal protection context, intermediate scrutiny only requires that the law be substantially related to an important government interest. *See Ramos v. Town of Vernon*, 353 F.3d 171, 175 (2d Cir.2003) (distinguishing between two forms of heightened scrutiny: (1) strict scrutiny, under which a law will be upheld only if it is "narrowly tailored" to meet "compelling government objectives;" and (2) intermediate scrutiny, which requires that a law be "substantially related" to "important government objectives"); *see also Heckler v. Mathews*, 465 U.S. 728, 744–45, 104 S.Ct. 1387, 79 L.Ed.2d 646 (1984). In the First Amendment context, intermediate scrutiny also requires that the statute be "narrowly tailored." *Ward v. Rock Against Racism*, 491 U.S. 781, 799, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989); *see IMS Health Inc. v. Sorrell*, 630 F.3d 263, 275 (2d Cir.2010) (holding, in the context of a First Amendment challenge, that "for the statute to survive intermediate scrutiny, the government must assert a substantial state interest that is directly advanced by the statute, and the regulation must not be more extensive than necessary to achieve the government's interest"), aff'd —— U.S. ——, 131 S.Ct. 2653, 180 L.Ed.2d 544 (2011).

 "Narrow tailoring" in the context of First Amendment intermediate scrutiny does not require a perfect fit between the regulation and the government interest at stake.

> The requirement of narrow tailoring is satisfied so long as the ... regulation promotes a substantial government interest that would be achieved less effectively absent the regulation.... So long as the means chosen are not substantially broader than necessary to achieve the government's interest, however, the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less ... restrictive alternative.

*Ward*, 491 U.S. at 799, 109 S.Ct. 2746 (internal citations and quotations omitted); *but cf. O'Brien*, 391 U.S. at 376–77, 88 S.Ct. 1673 ("[W]e think it clear that a government regulation is sufficiently justified ... if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest."). Where the government made a "reasonable determination that its interest ... would be best served" by a particular mode of regulation, the court must defer to that determination. *Ward*, 491 U.S. at 799, 109 S.Ct. 2746.

 Despite different formulations, courts have applied intermediate scrutiny in similar ways. Formulations of intermediate scrutiny "require the asserted governmental end to be ... either 'significant,' 'substantial,' or 'important.' " *Marzzarella*, 614 F.3d at 97–98 (analyzing Supreme Court First Amendment cases applying intermediate scrutiny); *see also O'Brien*, 391 U.S. at 376–77, 88 S.Ct. 1673 ("Whatever imprecision inheres in these terms, we think it clear that a government regulation is sufficiently justified ... if it furthers an important or substantial governmental interest."). The fit between the regulation and the government interest at stake must be reasonable. *Marzzarella*, 614 F.3d at 97–98 (finding that all formulations of intermediate scrutiny "generally require the fit between the challenged regulation and the asserted objective be reasonable, not perfect"); *see also United States v. Skoien*, 587 F.3d 803, 805–06 (7th Cir.2009) ("Under intermediate scrutiny,

the government need not establish a close fit between the statute's means and its end, but it must at least establish a *reasonable fit.*"); *Chester,* 628 F.3d at 683; *United States v. Oppedisano,* No. 09–cr–0305, 2010 WL 4961663, at *2 (E.D.N.Y. Nov. 30, 2010) (citing *Ramos,* 353 F.3d at 180). The regulation "need not be the least restrictive means of serving the interest." *Marzzarella,* 614 F.3d at 98 (citing *Turner Broad. Sys., Inc. v. FCC,* 512 U.S. 622, 662, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994) and *Ward,* 491 U.S. at 798–800, 109 S.Ct. 2746).

### 2. Right to Bear Arms

 The Second Amendment provides that "[a] well-regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. It confers an individual right to keep and bear arms specifically for the purpose of self-defense. *Heller,* 554 U.S. at 628, 128 S.Ct. 2783 ("[T]he inherent right of self-defense has been central to the Second Amendment right."); *id.* at 630, 128 S.Ct. 2783 (describing self-defense as the "core" purpose of the Second Amendment); *McDonald v. City of Chicago,* — U.S. —, 130 S.Ct. 3020, 3036, 177 L.Ed.2d 894 (2010) ("[I]n *Heller,* we held that individual self-defense is 'the *central component* [ ]' of the Second Amendment right.") (emphasis in original); *see also United States v. Barton,* 633 F.3d 168, 170–71 (3d Cir.2011) ("At the 'core' of the Second Amendment is the right of 'law-abiding, responsible citizens to use arms in defense of hearth and home.' "); *Masciandaro,* 638 F.3d at 467 (finding that "there now exists a clearly-defined fundamental right to possess firearms for self-defense within the home[,]" but that there remains uncertainty as to the "scope of that right beyond the home"); *Reese,* 627 F.3d at 800 ("[T]he [*Heller* ] Court suggested that the core purpose of the [Second Amendment]

right was to allow 'law-abiding, responsible citizens to use arms in defense of hearth and home.' ").

 Only those laws and regulations that substantially burden the right to keep and bear arms for the purpose of self-defense run afoul of the Second Amendment. *See Heller,* 554 U.S. at 595, 128 S.Ct. 2783 ("The right was not unlimited, just as the First Amendment's right of free speech was not ... [W]e do not read the Second Amendment to protect the right of citizens to carry arms for *any sort* of confrontation, just as we do not read the First Amendment to protect the right of citizens to speak for *any purpose.*"); *id.* at 626, 128 S.Ct. 2783 ("[T]he right [to bear arms] was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose."); *see also McDonald,* 130 S.Ct. at 3047 (reiterating the limits on the right to bear arms); Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self–Defense,* 56 UCLA L. Rev. 1443, 1456–57 (2009) (noting that *Heller* struck down the handgun ban at issue because it made "self-defense materially more difficult" and that the *Heller* Court's "analysis suggested that the severity of the burden was important").

 The right to self-defense in the home belongs to "law-abiding citizens for lawful purposes." *Heller,* 554 U.S. at 627, 128 S.Ct. 2783. It does not prohibit government regulation of firearms outside of the home or limitations on ownership of certain firearms; nor does it prevent the government from limiting the use of firearms for specific purposes or by specific people.

 Second Amendment protections thus only extend to those weapons typically possessed for the purpose of lawful self-defense. *Heller,* 554 U.S. at 627, 128 S.Ct.

2783 (interpreting *United States v. Miller*, 307 U.S. 174, 59 S.Ct. 816, 83 L.Ed. 1206 (1939)) (stating that "the Second Amendment right ... extends only to certain types of weapons"; in light of the "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons,'" it affords no protection to "weapons not typically possessed by law-abiding citizens for lawful purposes"); *United States v. Tagg*, 572 F.3d 1320, 1326 (11th Cir.2009) (holding that the Second Amendment does not encompass a right to keep and bear pipe bombs because they cannot be used for legitimate lawful purposes).

■ Similarly, the "prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms" are "longstanding" and "presumptively lawful." *Heller*, 554 U.S. at 626–27, 128 S.Ct. 2783; *see also McDonald*, 130 S.Ct. at 3047. *But see* Marshall, *supra*, at 698 (arguing, based on the ratification history of the Second Amendment, that "(1) stripping a person of his right to keep and bear arms for a 'felony' conviction is constitutionally dubious unless the conviction was for a 'crime of violence,' a term having a longstanding yet flexible meaning specially developed for arms regulations; and (2) although some disability is plainly justified for persons convicted of crimes of violence, a lifetime ban on all keeping of firearms by such felons is also constitutionally dubious"). The Court emphasized that it "identif[ied] these presumptively lawful regulatory measures only as examples; our list does not purport to be exhaustive." *Heller*, 554 U.S. at 627 n. 26, 128 S.Ct. 2783; *see also, e.g., City of New York v. Bob Moates' Sport Shop, Inc.*, 253 F.R.D. 237, 242 (E.D.N.Y.2008) ("It cannot be concluded that *Heller* places in doubt all state and local control of guns required to pro-

tect citizens, particularly in urban communities.... To transmutate *Heller* into an inhibition on long standing ancient ... powers of the state to control nuisances, the power of the federal government to regulate firearms that flow through the stream of interstate commerce, and the power of the federal judiciary in diversity cases to enforce that state substantive law is almost inconceivable.").

■ The Supreme Court has indicated that some form of heightened scrutiny is necessary when the conduct at issue falls within the core of the Second Amendment right to bear arms for the purpose of self-defense in the home. *See Heller*, 554 U.S. at 629 n. 27, 128 S.Ct. 2783 ("If all that was required to overcome the right to keep and bear arms was a rational basis, the Second Amendment would be redundant with the separate constitutional prohibitions on irrational laws, and would have no effect."). As already noted, most courts of appeals have found that regulations which substantially burden the right to keep and to bear arms for the purpose of self-defense should receive intermediate scrutiny. *Nordyke*, 644 F.3d at 786; *Masciandaro*, 638 F.3d at 469–70; *Chester*, 628 F.3d at 680–83; *Marzzarella*, 614 F.3d at 89; *see also Heller v. District of Columbia*, 698 F.Supp.2d 179, 188 (D.D.C.2010); *Reese*, 627 F.3d at 800–01. *But see United States v. Engstrum*, 609 F.Supp.2d 1227, 1231–32 (D.Utah 2009) (applying strict scrutiny). By contrast, laws that do not substantially burden the right to keep and to bear arms for this purpose are not entitled to any level of heightened scrutiny. *Nordyke*, 644 F.3d at 784.

### 3. 18 U.S.C. § 922(n) Imposes a Substantial Burden

■ To evaluate the burden placed on a constitutional right by government regulation, courts determine whether the

restriction leaves open sufficient alternative avenues for exercising that right. *E.g. Ward,* 491 U.S. at 791, 109 S.Ct. 2746 (evaluating whether a restriction on the time, place, or manner of protected speech "leave[s] open ample alternative channels for communication of the information"). "Following this lead, when deciding whether a restriction ... substantially burdens Second Amendment rights, we should ask whether the restriction leaves law-abiding citizens with reasonable alternative means for obtaining firearms sufficient for self-defense purposes." *Nordyke,* 644 F.3d at 787–88; *see United States v. Marzzarella,* 595 F.Supp.2d 596, 606 (W.D.Pa.2009) (upholding the ban on possessing a firearm with obliterated serial number because it leaves "open ample opportunity for law-abiding citizens to own and possess guns," imposing only an "incidental and minimal" burden on the right to bear arms), *aff'd,* 614 F.3d at 95.

■■■ Statutes that criminalize access to guns by particular classes of individuals burden Second Amendment rights. *See Reese,* 627 F.3d at 800 ("[T]here is little doubt that the challenged law, § 922(g)(8), imposes a burden on conduct, i.e., [defendant]'s possession of otherwise legal firearms, that generally falls within the scope of the right guaranteed by the Second Amendment.").

The statute at issue in this case arguably falls within the core of the Second Amendment right. Section 922(n) is different than a prohibition on gun possession by felons, which the *Heller* court described as "presumptively lawful." Because of the presumption of innocence, it is assumed until conviction that the defendant is not guilty of the initial indictment triggering criminal liability. Thus, for purposes of construing the statute, a defendant under indictment is a "law-abiding citizen" who remains eligible for Second Amendment protections. At the same time, if the individual only received a gun after indictment, this conduct raises the suspicion that his purpose is not self-defense in the home, but further crime.

Even if the burden it inflicts is not insignificant, it is temporary. It lasts only from indictment to conviction or acquittal. While the provision does not prohibit individuals under indictment from owning or possessing guns for the purposes of self-defense in the home, it restricts their ability to acquire a weapon until they are free of the indictment.

Unless the defendant already possesses a firearm prior to his indictment, § 922(n) does deny him the ability to keep and bear arms for the purpose of self-defense in his home. This burden may last for a year or more before the initial indictment is adjudicated. *See* Bureau of Justice Statistics, U.S. Dep't of Justice, *Compendium of Federal Justice Statistics, 2004* 63 (2006) (showing that the average case processing time for a felony was 10.1 months, but that some types of cases lasted more than twenty months on average). Section 922(n) does infringe on Second Amendment rights.

### 4. No More Than Intermediate Scrutiny is Appropriate

The Supreme Court has indicated that some form of heightened scrutiny is necessary for laws that infringe on core Second Amendment rights. In *Heller,* the Supreme Court declined to state what level of review is appropriate for statutes that infringe on the core Second Amendment right to bear arms for the purpose of self-defense. It stated that the right to bear arms is a fundamental right, *McDonald,* 130 S.Ct. at 3042, hinting that strict scrutiny might be appropriate, *see, e.g., Clark,* 486 U.S. at 461, 108 S.Ct. 1910 ("[C]lassifications affecting fundamental rights ... are given the most exacting scrutiny.").

"Whether or not strict scrutiny may apply to particular Second Amendment challenges, it is not the case that it must be applied to all Second Amendment challenges." *Marzzarella,* 614 F.3d at 96. In *Heller,* the Court analogized the Second Amendment to the First Amendment.

> *[T]he right [to bear arms] was not unlimited,* just as the First Amendment's right of free speech was not. . . . Thus, we do not read the Second Amendment to protect the right of citizens to carry arms for any sort of confrontation, just as we do not read the First Amendment to protect the right of citizens to speak for *any purpose.*

*Heller,* 554 U.S. at 594, 128 S.Ct. 2783 (emphasis added). Thus, like statutes affecting the fundamental right to free speech, statutes infringing on the right to bear arms could be subject to intermediate (or even lesser) scrutiny depending on the particular circumstances. *See O'Brien,* 391 U.S. at 377, 88 S.Ct. 1673 (holding that content-neutral restrictions on the time, place, and manner of speech are subject to a form of intermediate scrutiny); *Int'l Soc'y for Krishna Consciousness v. Lee,* 505 U.S. 672, 678–79, 112 S.Ct. 2701, 120 L.Ed.2d 541 (1992) (noting that limitations on expressive activity conducted in a nonpublic forum need only be reasonable, as long as they are viewpoint neutral).

Courts of appeals have adopted intermediate scrutiny to evaluate restrictions on gun possession by particular people or in particular places, analogizing these regulations to time, place, and manner restrictions on speech. *Masciandaro,* 638 F.3d at 473–74 (upholding prohibition on carrying a loaded firearm in a national park); *Heller v. District of Columbia,* 670 F.3d 1244, 1257–58, 2011 WL 4551558, at *10 (D.C.Cir.2011) (*Heller II* ) (remanding case to determine whether gun registration requirements survive intermediate scrutiny); *Chester,* 628 F.3d at 683 (same); *Reese,* 627 F.3d at 800 (upholding § 922(g)(8),

which prohibits possession of a firearm by a person subject to a domestic protection order); *Marzzarella,* 614 F.3d at 96 (upholding 18 U.S.C. § 922(k), which prohibits the possession of firearms with obliterated serial numbers); *Skoien,* 614 F.3d at 641 (upholding 18 U.S.C. § 922(g)(9), which prohibits any person "who has been convicted in any court of a misdemeanor crime of domestic violence" from possessing firearms).

Two district courts in the Second Circuit have applied intermediate scrutiny to similar laws. *See Osterweil v. Bartlett,* 819 F.Supp.2d 72, No. 1:09–cv–825, 2011 WL 1983340 (N.D.N.Y. May 20, 2011) (finding that New York State's gun licensing scheme survived intermediate scrutiny); *Oppedisano,* 2010 WL 4961663, at *2 (holding that prohibition on possession of ammunition by a felon survived intermediate scrutiny as applied to a felon convicted of attempted reckless endangerment and driving while intoxicated).

Applying intermediate scrutiny, courts have upheld a number of restrictions on gun ownership and possession. In *Marzzarella,* for example, the Court of Appeals for the Third Circuit held that a federal ban on transportation, receipt, and possession of any firearm which has had the importer's or manufacturer's serial number removed was related to the "substantial or important" "law enforcement interest in enabling the tracing of weapons via their serial numbers." 614 F.3d at 98. It "fits reasonably with that interest in that it reaches only conduct creating a substantial risk of rendering a firearm untraceable." *Id.* By contrast, the Court of Appeals for the Fourth Circuit concluded that the government had not yet "carried its burden of establishing a reasonable fit between the important object of reducing domestic gun violence and § 922(g)(9)'s permanent disarmament of all domestic-

violence misdemeanants." *Chester*, 628 F.3d at 683. While "[t]he government has offered numerous plausible *reasons* why the disarmament of domestic violence misdemeanants is substantially related to an important government goal; … it has not attempted to offer sufficient *evidence* to establish a substantial relationship between § 922(g)(9) and an important governmental goal." *Id.*; *cf. Skoien*, 614 F.3d at 642 (upholding a prohibition on gun possession by misdemeanants convicted of domestic violence following a discussion of the empirical evidence supporting the relationship between the statute and the important government interest at stake). For the purposes of an as-applied challenge, courts have accepted evidence of the defendant's own violent past to show a substantial relationship between a statute and its objective of preventing access to guns. *See United States v. Williams*, 616 F.3d 685, 693 (7th Cir.2010) (upholding § 922(g)(1), which criminalizes gun possession by felons).

■ Intermediate scrutiny is the appropriate level of review for the statute at issue in the present case. *But see Masciandaro*, 638 F.3d at 471 ("[W]e assume that any law that would burden the "fundamental," core right of self-defense in the home by a law-abiding citizen would be subject to strict scrutiny.").

Unlike the total ban at issue in *Heller*, § 922(n) applies only to a narrow class of persons, rather than to the public at large. It is substantially similar to § 922(g)(9) and § 922(g)(8), the statutes at issue in *Skoien* and *Reese*, respectively. Both of those provisions prohibit the *possession* of firearms by narrow classes of persons who, based on their past behavior, are more likely to engage in domestic violence for an unlimited period. Section 922(n) is less restrictive than either of those statutes, since it only criminalizes shipping, transportation, or receipt of a firearm, not possession. It also only applies for the limited period between indictment and either acquittal or conviction. Intermediate, not strict, scrutiny is appropriate.

### 5. 18 U.S.C. § 922(n) Survives Intermediate Scrutiny

■ Prior to *Heller*, several courts ruled that 18 U.S.C. § 922(n) and predecessor statutes did not violate the Second Amendment. *Rivero*, 218 Fed.Appx. at 958; *see also Cases*, 131 F.2d at 923. As noted above, no court has ruled on the constitutionality of the statute since *Heller*. Because it is substantially related to an important government interest and is narrowly drawn to exclude the vast majority of gun holders, it survives intermediate scrutiny.

The prohibition at issue in this case is less restrictive than other subsections of 18 U.S.C. § 922, which totally ban possession by particular categories of people, such as felons or misdemeanants convicted of domestic violence. *See, e.g.*, 18 U.S.C. § 922(g). Courts have continued to uphold such provisions in the wake of *Heller*. *E.g. United States v. Barton*, 633 F.3d 168 (3d Cir.2011) (holding that defendant's conviction for being a felon in possession of a firearm and ammunition did not violate his Second Amendment rights); *United States v. Scroggins*, 599 F.3d 433, 451 (5th Cir.2010) (same); *United States v. Rozier*, 598 F.3d 768, 771 (11th Cir.2010) (same); *United States v. McCane*, 573 F.3d 1037, 1047 (10th Cir.2009) (same); *United States v. Yancey*, 621 F.3d 681 (7th Cir.2010) (upholding statute prohibiting gun possession by illegal drug users); *United States v. White*, 593 F.3d 1199, 1205–06 (11th Cir.2010) (holding that Second Amendment was not violated by statutory prohibition against possession of firearms by persons convicted of misdemeanor crime of domestic violence). *But see Britt v. State*, 363 N.C. 546, 681 S.E.2d 320, 323 (2009) (find-

ing that a felon convicted in 1979 of one count of possession of a controlled substance with intent to distribute had a constitutional right to keep and bear arms under the North Carolina Constitution). They have survived intermediate scrutiny. *Skoien*, 614 F.3d at 641 (upholding 18 U.S.C. § 922(g)(9), which prohibits any person "who has been convicted in any court of a misdemeanor crime of domestic violence" from possessing firearms).

Concededly, given the presumption of innocence, the government's categorical presumption that all individuals under indictment for a felony are more likely to misuse firearms is somewhat suspect. *See* Part V(D), *supra; see also* Bureau of Justice Statistics, U.S. Dep't of Justice, *Compendium of Federal Justice Statistics, 2004* 54 (2006) (stating that, in 2004, only 1.8% of felony defendants violated the terms of their pre-trial release by committing any other crime). Congress appears to have determined, however, that a narrower ban would not serve its interest in public safety. Initially, Congress only limited receipt of firearms by violent indictees. Federal Firearms Act of 1938, 75 Cong. Ch. 850, § 2(e), 52 Stat. 1250, 1251. After three decades of experience, it saw the need to expand the prohibition to all indictees. Act of Oct. 3, 1961, Pub.L. No. 87–342, 75 Stat. 757.

 As demonstrated by the facts of this case of this case, it cannot be said that Congress' determination to criminalize the act of receiving a firearm while under indictment was unreasonable, and that "no set of circumstances ... under which [the statute] would be valid." *Salerno*, 481 U.S. at 745, 107 S.Ct. 2095. Laurent was initially indicted in state court for crimes arising out of gun play in a residential building. He was subsequently arrested after allegedly robbing another individual at gun point. The fact that Laurent was charged with the instant crime because he apparently committed a crime of violence while under indictment undermines any claim he might have that § 922(n) is not substantially related to preventing him from engaging in further violence. He is hardly the law-abiding householder with a gun at home to protect his family. The statute is thus also not unconstitutional as applied to this defendant.

The fact that Laurent may eventually plead to a misdemeanor is not of statutory or constitutional significance. The crime is committed when the firearm is obtained while the defendant is under a felony indictment; dismissal, acquittal, or conviction does not affect that fact. So long as the government can show that he was under indictment for a felony at the time he received a firearm, he may be convicted under § 922(n).

Because the statute is substantially and directly related to the important government interest in public safety, it survives intermediate scrutiny under the Second Amendment.

### F. Equal Protection

The indictment does not violate Laurent's right to the equal protection of the laws.

 The Fourteenth Amendment's Equal Protection Clause by its terms is only applicable to the states. U.S. Const. amend. XIV ("No *State* shall ... deny to any person within its jurisdiction the equal protection of the laws." (emphasis added)). While the Fifth Amendment does not contain an explicit equal protection clause, it has been interpreted to provide the same basic safeguards. *See Schneider v. Rusk*, 377 U.S. 163, 168, 84 S.Ct. 1187, 12 L.Ed.2d 218 (1964); *Shapiro v. Thompson*, 394 U.S. 618, 642, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969); *Bolling v. Sharpe*, 347 U.S. 497, 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954). The principles of the former thus

apply to the latter. *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 217, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995); *see also United States v. Paradise*, 480 U.S. 149, 166 n. 16, 107 S.Ct. 1053, 94 L.Ed.2d 203 (1987) (plurality op.) ("[T]he reach of the equal protection guarantee of the Fifth Amendment is coextensive with that of the Fourteenth"); *Weinberger v. Wiesenfeld*, 420 U.S. 636, 638 n. 2, 95 S.Ct. 1225, 43 L.Ed.2d 514 (1975) ("This Court's approach to Fifth Amendment equal protection claims has always been precisely the same as to equal protection claims under the Fourteenth Amendment."); *Buckley v. Valeo*, 424 U.S. 1, 93, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) ("Equal protection analysis in the Fifth Amendment area is the same as that under the Fourteenth Amendment.").

It has been held that § 922(n) and its predecessors do not violate the equal protection principles protected by the Due Process Clause. *See Craven*, 478 F.2d at 1338–39; *Thoresen*, 428 F.2d 654; *Weingartner*, 485 F.Supp. at 1172. These decisions were based on the assumption that "shipping or transporting firearms in interstate commerce is not a fundamental right." *Craven*, 478 F.2d at 1338–39; *see also Thoresen*, 428 F.2d at 662. The statute was thus evaluated under rational basis scrutiny.

To the extent that § 922(n) infringes on the Second Amendment right to bear arms, it is subject to intermediate scrutiny. For the reasons discussed in Part V(E)(5), *supra*, it survives such scrutiny.

▮▮▮▮ To the extent that § 922(n) distinguishes between individuals under indictment and others, it does not seriously burden the presumption of innocence, *see* Part V(D), *supra*, and need only survive rational basis scrutiny. Although potentially overbroad, it cannot be concluded that Congress was irrational in concluding that individuals under indictment are more likely to misuse firearms than the general population and that § 922 was properly designed to protect the public against a narrowly defined group of people who are more dangerous than most. *See Cases*, 131 F.2d at 921 ("[C]ertainly no one can seriously contend that the test of unfitness which Congress established[—whether a defendant is under indictment for a felony—]is irrelevant to that purpose [public safety]."); *see also Thoresen*, 428 F.2d at 662 ("[I]t is not unreasonable for Congress to conclude that there is considerable likelihood that one indicted for such an offense has a propensity to misuse firearms."); S.Rep. No. 98–225, at 3 (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3185 (remarking on "the alarming problem of crimes committed by persons on [pre-trial] release" in discussing the Bail Reform Act of 1984, 18 U.S.C. § 3141 *et seq.*). Laurent's own criminal history shows that limitations on access to guns by indictees may be in the public interest.

## G. Procedural Due Process

▮▮▮▮ The Due Process Clause of the Fifth Amendment prohibits the federal governments from depriving any person of "life, liberty, or property, without due process of law." U.S. Const. amend. V. This clause protects both procedural and substantive rights. "When government action depriving a person of life, liberty, or property survives substantive due process scrutiny, it must still be implemented in a fair manner....This requirement has traditionally been referred to as 'procedural due process.'" *Salerno*, 481 U.S. at 746, 107 S.Ct. 2095. "Procedural due process rules are meant to protect persons ... from the mistaken or unjustified deprivation of life, liberty, or property." *Carey v. Piphus*, 435 U.S. 247, 259, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978). It not only prevents the state from withdrawing benefits from those who are entitled to them, *see*

*Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), but from depriving individuals of their rights wrongfully and needlessly. The Supreme Court has used procedural due process to determine the appropriate standard of proof required for civil commitment, *Addington v. Texas,* 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979); whether a defendant may be deprived of his liberty and detained pre-trial, *United States v. Salerno,* 481 U.S. 739, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987); and whether an undocumented immigrant may be so deprived and detained pending deportation, *Demore v. Kim,* 538 U.S. 510, 123 S.Ct. 1708, 155 L.Ed.2d 724 (2003).

 Individuals under indictment have a procedural due process right not to be needlessly deprived of their liberties, including their Second Amendment rights. Under procedural due process, "standard analysis ... proceeds in two steps: We first ask whether there exists a liberty ... interest of which a person has been deprived, and if so we ask whether the procedures followed ... were constitutionally sufficient." *Swarthout v. Cooke,* — U.S. ——, 131 S.Ct. 859, 862, 178 L.Ed.2d 732 (2011). To determine whether there have been sufficient procedural protections, courts rely on the test articulated in *Mathews v. Eldridge,* balancing 1) "the private interest that will be affected by the official action;" 2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards;" and 3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." 424 U.S. at 335, 96 S.Ct. 893.

Some categorical prohibitions on access to guns have been struck down as violating procedural due process. For example, the

Adam Walsh provisions mandate, among other things, that a defendant charged with a child pornography offense be required to "refrain from possessing a firearm" as a condition of pre-trial release. 18 U.S.C. § 3142(c)(1)(B); *see also* Adam Walsh Child Protection and Safety Act of 2006, Pub.L. 109–248, § 216, 120 Stat. 587 (codified at 18 U.S.C. § 3142). Several courts have held that those provisions violate due process on their face because they "establish that an arrest on the stated charges, without more, irrebuttably establishes that such conditions are required, thereby eliminating the accused's right to an independent judicial determination as to required release conditions, in violation of the right to procedural due process ... under the Fifth Amendment." *Crowell,* 2006 WL 3541736, at *10; *see also Arzberger,* 592 F.Supp.2d at 602–603 (striking down provisions on their face); *cf. Polouizzi,* 697 F.Supp.2d at 394–95 (holding that requirement that all individuals under arrest for child pornography charges be required to undergo electronic monitoring as a condition of pre-trial release unconstitutional as applied).

In the instant case, the statute does not violate procedural due process either on its face or as applied to this defendant.

### 1. Private Interest at Stake

 As discussed in Part V(E), *supra,* the instant statute arguably burdens indictees' fundamental right to bear arms. The consequences of this deprivation may be severe. Section 922(n) not only denies an individual of their right to bear arms; it permits the government to charge that individual with a new substantive offense and to impose additional punishment as a result.

The prohibition imposed, however, is substantially narrower than that enforced through the Adam Walsh Amendments. Unlike those Amendments, § 922(n) only

criminalizes shipping, transportation, or receipt of firearms. It does not categorically prohibit an individual under indictment from retaining weapons already in his possession for the purpose of lawful self-defense in the home. The private interest at stake is thus less than that at issue in *Crowell* and *Arzberger.*

## 2. Risk of Erroneous Deprivation

Categorical prohibitions on the liberties of arrestees and indictees are rare. *See* Part IV(B). An individual determination of risk is the norm.

In *Salerno,* the Court upheld the constitutionality of the Bail Reform Act's provision permitting "pretrial detention on the ground that the arrestee is likely to commit future crimes" against a procedural due process challenge. *Id.* at 744, 750, 107 S.Ct. 2095. The provision withstood constitutional scrutiny precisely because it included procedural protections—including an individualized finding of risk to the public—which are absent from § 922(n). *Id.* at 750, 751–52, 107 S.Ct. 2095 (internal citations omitted) (emphasis added).

Without an individual determination of risk by the court that issued the original indictment, erroneous deprivation is possible in at least some cases. While individuals with a history of violent offenses may reasonably be suspected to present a high risk of continuing this pattern while awaiting trial, the same cannot be said categorically of individuals with no criminal background under indictment for non-violent crimes. Because section § 922(n) does not require any individualized judicial consideration, it burdens all accused persons, even those who present no risks.

In this case, it is clear that the deprivation would not be found erroneous in an individual judicial hearing. Defendant was initially indicted in state court for criminal possession of a weapon, reckless endangerment, and witness intimidation, among other offenses. It is unclear from the record whether the state trial court exercised its power to revoke or suspend the defendant's firearms license, order the defendant ineligible for such a license, or order the immediate surrender of any or all firearms owned or possessed. N.Y.Crim. Proc. § 530.14. There is little doubt, however, that had an individualized determination of dangerousness by the state trial judge been made in this case, the defendant could have been constitutionally and reasonably deprived of his right to ship, transport, or receive firearms while awaiting trial.

## 3. Government Interest at Stake

As a general matter, the government's interest in preventing crime by indictees is significant. *See* Part III(D), *supra.* Nor is the risk of erroneous deprivation easily cured by additional procedures. Unlike the Adam Walsh amendments, which are limited to federal defendants, § 922(n) applies to all indictees. In order to be meaningful, any individual determination of dangerousness would have to be performed by the trial court following the initial indictment. A requirement of additional process would thus implicate state as well as federal procedures. State procedures may not permit a trial judge to prohibit receipt of firearms in all cases involving potentially dangerous defendants. *See, e.g.,* N.Y.Crim. Proc. § 530.14 (authorizing the trial judge to restrict access to guns only in cases involving orders of protection). The ability of § 922(n) to protect the significant government interest in public safety would be significantly impaired if the applicability of the statute turned on state criminal procedure.

On its face, the government interest at stake in this case outweighs the private interest in shipping, transporting, or receiving a firearm while under indictment and the risk of erroneous deprivation. As applied to this defendant, the deprivation

was not erroneous. Section 922(n) does not violate procedural due process as applied to him.

## VI. Power to Dismiss for Insufficient Evidence

Defendant moved for a bill of particulars stating when and where he allegedly received the firearm while under indictment. Def.'s Mem. of Law in Supp. of Pre–Trial Mot., Doc. Entry 49, Nov. 18, 2011. The motion was granted. Court's Mem. & Order, Doc. Entry 53, Nov. 23, 2011. If the government fails to come forward with sufficient evidence to establish a violation of the statute as interpreted herein, *see* Part III(C), *supra*, the court will dismiss the indictment.

 The Federal Rules of Criminal Procedure require that an indictment set forth a "plain, concise, and definite written statement of the essential facts constituting an offense." Fed.R.Crim.P. 7(c). "[A]n indictment is sufficient when it charges a crime with sufficient precision to inform the defendant of the charges he must meet and with enough detail that he may plead double jeopardy in a future prosecution based on the same set of events." *United States v. Walsh*, 194 F.3d 37, 44 (2d Cir.1999); *see also Hamling v. United States*, 418 U.S. 87, 117–18, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974). The Court of Appeals for the Second Circuit has "consistently upheld indictments that do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." *United States v. Pirro*, 212 F.3d 86, 92 (2d Cir.2000). Motions to dismiss indictments are disfavored. *See, e.g., United States v. De La Pava*, 268 F.3d 157, 165 (2d Cir.2001).

 Trial courts retain the power to dismiss a defective indictment in some instances. Under Federal Rules of Criminal Procedure 12(b), "[a] party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial of the general issue." Fed. R.Crim.P. 12(b)(2). The Court of Appeals for the Second Circuit has defined the "general issue" as "whether the defendant is guilty of the offense charged." *United States v. Doe*, 63 F.3d 121, 125 (2d Cir. 1995). A trial court may dismiss an indictment that does not state an offense under the charged statute. *United States v. Aleynikov*, 737 F.Supp.2d 173, 176 (S.D.N.Y. 2010) ("Dismissal is required where the conduct alleged in the indictment as a factual basis for the offense is not actually prohibited by the language of the statute."); *United States v. Russell*, 639 F.Supp.2d 226, 231 (D.Conn.2007) ("It would be proper, however, to dismiss an indictment that fails to state an offense under the charged statute."), *abrogated on other grounds by United States v. Gray*, 642 F.3d 371 (2d Cir.2011); *see generally United States v. Mennuti*, 639 F.2d 107 (2d Cir.1981) (upholding district court's pre-trial dismissal of an indictment on the ground that the government's proposed proof would not establish a crime within the terms of the statute).

Sufficiency challenges often turn on the meaning of a statutory term. *See United States v. Perez*, 575 F.3d 164, 166 (2009) (citing *Cuellar v. United States*, 553 U.S. 550, 128 S.Ct. 1994, 170 L.Ed.2d 942 (2008) and *Bailey v. United States*, 516 U.S. 137, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995)). Here, the critical question is whether the government can establish when the defendant received the gun—a "receipt."

 In general, the validity of an indictment is tested by its allegations, not by whether the government can prove its case beyond a reasonable doubt at trial. *See United States v. Sampson*, 371 U.S. 75, 76, 83 S.Ct. 173, 9 L.Ed.2d 136 (1962); *United States v. Perez*, 575 F.3d 164, 166

(2d Cir.2009). There is "no basis to challenge the sufficiency of the indictment before trial" when it "me[e]t[s] the basic pleading requirements" and is "valid on its face." *Perez,* 575 F.3d at 166. A technically sufficient indictment thus "is not subject to dismissal on the basis of factual questions, the resolution of which must await trial." *United States v. Alfonso,* 143 F.3d 772, 776–77 (2d Cir.1998).

■ The sufficiency of the evidence, as opposed to the allegations, may be appropriately addressed on a pretrial motion to dismiss an indictment only where "the government has made what can fairly be described as a full proffer of the evidence it intends to present at trial." *Alfonso,* 143 F.3d at 776–77; *see generally Mennuti,* 639 F.2d 107 (upholding the district court's decision to dismiss an indictment for failure to prove that the crime affected interstate or foreign commerce, where the government had submitted an affidavit outlining their evidence on this point). As the Court of Appeals for the Second Circuit has noted, "in some cases the government may actually favor such a pretrial ruling" because "that would permit an immediate appeal from a ruling adverse to the government." *Alfonso,* 143 F.3d at 777 n. 7. If the case goes to trial and a Federal Rules of Criminal Procedure Rule 29 motion for a judgment of acquittal for failure to satisfy an element of the offense is granted, "the government would have no opportunity to appeal." *Id. (citing United States v. Scott,* 437 U.S. 82, 91, 98 S.Ct. 2187, 57 L.Ed.2d 65 (1978)).

Under the order granting defendant's motion for a bill of particulars, the government is required to "outline any evidence it has regarding when and where the defendant received the gun," "exchange the names of any witnesses expected to testify on this issue" as well as summaries of that testimony, and turn over "[a]ll relevant documents on this issue." Ct.'s Mem. &

Order, Doc. Entry 53, Nov. 23, 2011. Compliance with this order will be sufficient to constitute "a full proffer of the evidence it intends to present at trial." *Alfonso,* 143 F.3d at 776–77. If the government's evidence establishes that the defendant could not be found guilty of committing a crime under § 922(n), the indictment should be dismissed. A dismissal before the jury is convened would avoid the problem of double jeopardy that would arise if the dismissal occurred during trial.

## VII. Conclusion

Both on its face and as applied to this defendant, § 922(n) is constitutional. Defendant's motion to dismiss the indictment as unconstitutional is denied.

The government must present some particulars to support the charge that the defendant received the gun *after* he became aware of the indictment, or the indictment will be dismissed for failure to charge a crime under § 922(n).

SO ORDERED.