OPINION OF THE COURT
Barbara Howe, S.
Decedent died at age 68 on September 19, 2011, survived by three adult children. His will, dated March 19, 2002, nominated his then-wife, Susan, to be the fiduciary of his estate.[1]
By petition verified January 6, 2012, decedent’s daughter, Mary Dolloff, sought to become administrator c.t.a. of the estate, “for the sole purpose of [defending] an action entitled *442 ‘Susan F. Dolloff v HSBC Bank USA, HSBC Mortgage Corp, Lawrence J. Dolloff, et al’ - Supreme Court, Erie County, Index No. 2009-7576.” Susan, who had been divorced from decedent in 2008, and the alternate nominated fiduciaries executed renunciations, and, by decree dated February 6, 2012, decedent’s will was admitted to probate and Mary was appointed administrator c.t.a. with restrictions and limitations as requested in her petition.
In June 2013, the United States Life Insurance Company in the City of New York (hereafter, US Life), brought a motion in this estate matter pursuant to EPTL 5-1.4 (d) (2) seeking permission to deposit into court $1,300,000 in proceeds under a certain policy issued by US Life insuring decedent’s life, asserting in its motion papers that it “is no more than an uninterested third-party” as to who should receive the policy proceeds. Susan, who was named the beneficiary under the policy in 2002, opposed the motion, arguing that this court should pay over the policy proceeds to her. The estate’s position on the US Life motion, as reflected in an affirmation from the administrator’s attorney, was that
“division of the proceeds from this policy is substantially a question of law for the court to determine. This is based upon the fact that all parties are aware that Susan Dolloff maintained the policy in question by paying the premiums until the death of her former husband, Lawrence J. Dolloff’ (emphasis added).
By memorandum and order dated August 22, 2013,1 granted the application by US Life, and directed that the subject policy proceeds be paid into court by depositing those proceeds with the Erie County Treasurer.
On September 13, 2013, full letters of administration c.t.a. were issued to Mary, upon her amended petition for such relief.
In March 2014, Susan filed a verified petition in this court seeking a determination that she is entitled to all or some of the proceeds of the $1,300,000 life insurance policy. Susan also sought the imposition of a constructive trust in her favor over the proceeds as part of her alternate grounds for relief. In her petition, Susan named the estate as a party-respondent, as well as the Lexington Insurance Company (hereafter, Lexington). Lexington was named by Susan, according to her petition, because, “[u]pon information and belief . . . [Lexington] is a *443 creditor of Decedent’s Estate.” Lexington answered the petition and “cross-moved” for summary judgment.[2]
By memorandum and order dated September 19, 2014, I concluded that Susan’s proceeding was one for advice and direction pursuant to SCPA 2107 (see Matter of Mastroianni, 105 AD3d 1136 [2013]). I further found that jurisdiction had not been obtained over all necessary parties, and that, in addition, issue had not been joined even as to all of those parties who were then before the court in the proceeding. Finally, I found that a motion for summary judgment by Lexington seeking to dismiss the petition was, under all the circumstances, premature.
Following my September 19, 2014, decision, and in accordance with my directions, Susan filed an amended petition naming all necessary parties to her proceeding. An amended order to show cause was then issued by this court, and service was timely made on all parties. When the parties were next before the court in November 2014, a verbal scheduling order was made (a) that necessary pleadings were to be filed so that issue was properly joined, (b) that Lexington’s original “cross motion” would then go forward (as it requested) as a summary judgment motion, and (c) that all parties had an opportunity to serve and file whatever papers (or additional papers) in regard to the summary judgment motion they deemed appropriate. Those scheduling directions have since been complied with.
Susan’s amended advice and direction petition seeks, as noted supra, a direction from this court that she is entitled to some or all of the $1,300,000 US Life policy proceeds, and she advances various reasons why this is so. Lexington, the estate, and DFS contend that no part of the policy proceeds should be paid to Susan. Decedent’s three children — Mary, Mark and Sara — in their answer verified by each on November 26, 2014, take the following position:
“Answering Respondents, MARY DOLLOFF a/k/a MARY GIAN, SARA DOLLOFF a/k/a SARA HILLIGAS and MARK DOLLOFF, individually, and as *444 the only children of the deceased, LAWRENCE DOLLOFF, assert that the Decedent’s pre- and post-divorce activity and actions clearly establish his intent that SUSAN DOLLOFF be the named beneficiary of the policy in question. Respondents respectfully request that the Amended petition be granted or, in the alternative, that a hearing be conducted concerning the continuation of the policy in its full force and effect” (emphasis added).
Issue having been joined, and all parties having had an opportunity to submit papers on Lexington’s motion for accelerated judgment, I now find and decide as follows.
A.
r
Susan and decedent were married in 1971, and there were three children of that union. Decedent, according to DFS, was an “excess lines [insurance] broker,” operating “by virtue of a license granted pursuant to New York State Insurance Law § 2105” under the corporate name of “L.J. Dolloff & Associates, Inc.”[3]
On December 4, 2007, Susan and decedent entered into and executed a “Matrimonial Separation and Settlement Agreement” (hereafter, the MSA), which was incorporated but not merged into an April 14, 2008, judgment of divorce. The MSA provided, inter alia, that decedent would make Susan the “irrevocable beneficiary” of life insurance proceeds “in the face amount of $500,000.”
In 2002, well prior to their divorce, Susan had been named by decedent as the beneficiary of the subject US Life policy, which was issued on June 4, 2002. On November 30, 2009, after he and Susan had been divorced for 19 months, decedent executed and delivered to US Life a document specifically relating to the subject policy in which he gave Susan “the authority to manage my account from this day forth. She also has power of attorney which I have enclosed” (emphasis added). This authorization was allegedly never revoked by decedent, and it was apparently in full force and effect at his death nearly two years later (Sept. 19, 2011). Throughout some or all of the *445 post-divorce period in question, Susan indicates that she paid the US Life policy premiums.
In opposing the relief sought by Lexington, Susan submitted a June 20, 2014 affidavit in which she recounts in some detail the history of the 2002 US Life policy, other insurance owned by decedent, and matters leading to her separation[4] and divorce from decedent. She also provided details about the MSA, which, insofar as immediately relevant here, are as follows:
“The United States Life policy was the only policy owned by decedent in 2007 which could have been used to satisfy the Separation Agreement. Section 7.1 of the Separation Agreement required decedent to maintain coverage for my benefit ‘for a period of ten years following the date this Agreement is signed’. The $1.3 million universal life policy provided by United States Life had a maturity date in 2043. . . . Other life insurance owned by decedent was scheduled to expire in a few years [2012] and would not satisfy the obligation. . . .
“It was never the intent of the Separation Agreement that the insurance under that agreement be limited to only $500,000. The Separation Agreement does not prohibit us from using a policy with greater coverage to satisfy the obligation. I caused that minimum provision to be included in the Separation Agreement in order to provide flexibility in case the decedent and I could no longer afford the cost of maintaining coverage under the United States Life insurance policy at the $1.3 million level, and its coverage had to be reduced in order to reduce the premium to a manageable level. . . .
“At that time that the United States Life insurance policy was purchased in 2002, and at the time of our separation in 2007 and when the Separation Agreement was finalized in the latter part of 2007, *446 there was no New York statute providing that our divorce would have any impact on my receipt of the proceeds of the United States Life insurance policy. All of the plans and arrangements discussed above were made based on the application of the law as it then existed. After I was divorced, I was assured by insurance agents that I was protected as long as I was the named beneficiary of the policy.
“In order to allow me to further protect my interest, I monitored and managed the United States Life insurance policy. United States Life allowed me to interact directly with the insurance company and obtain information, and manage the policy loan, and make decisions. The Separation Agreement anticipated that in Section 7.1. .
“The only possible explanation for such on-going management was to allow me standing to protect my position in the policy. The provision in Section 7.1 of the Separation Agreement that authorized me to monitor the policy for my protection is clearly inconsistent with the legislative assumption that decedent would have revoked my beneficiary designation if he thought to do so when we divorced. Instead, such provisions shows that decedent intended to ratify, confirm and continue in force the original beneficiary designation. . . .
“It is incomprehensible to me that a contract made by my then husband with United States Life Insurance Company to provide life insurance on himself for my benefit could be changed retroactively by the New York Legislature, especially when decedent confirmed his prior intent after the statute became effective. That is why I brought this petition to enforce not only my rights under the Separation Agreement, but the decedent’s rights to enforce the contract he made with United States Life in 2002, and reaffirmed in 2009” (emphasis added).
Finally, Susan’s amended petition contains the following sworn allegations:
“As a consequence of the provisions of Section 7.1 of the aforesaid Separation Agreement, and the Judgment of Divorce, Petitioner acquired a vested interest in the aforesaid insurance Policy issued by US Life, which rights attached to the proceeds of such Policy.
*447 “Petitioner would not have entered into the Separation Agreement with Decedent and relinquished her marital rights, but for the provisions of the said agreement, and in particular, the provisions thereof with respect to the life insurance on the life of Decedent” (emphasis added).
if
The issue before this court is whether Susan, decedent’s former spouse, or decedent’s estate is entitled to the US Life policy-proceeds. The crux of the dispute centers on EPTL 5-1.4 (a), which, insofar as relevant here, provides as follows:
“§ 5-1.4. Revocatory effect of divorce, annulment or declaration of nullity, or dissolution of marriage on disposition, appointment, provision, or nomination regarding a former spouse
“(a) Except as provided by the express terms of a governing instrument, a divorce (including a judicial separation as defined in subparagraph (f)(2)) or annulment of a marriage revokes any revocable (1) disposition or appointment of property made by a divorced individual to, or for the benefit of, the former spouse, including, but not limited to, a disposition or appointment by will, by security registration in beneficiary form (TOD), by beneficiary designation in a life insurance policy or (to the extent permitted by law) in a pension or retirement benefits plan, or by revocable trust, including a bank account in trust form, (2) provision conferring a power of appointment or power of disposition on the former spouse, and (3) nomination of the former spouse to serve in any fiduciary or representative capacity, including as a personal representative, executor, trustee, conservator, guardian, agent, or attorney-in-fact.
“(b)(1) Provisions of a governing instrument are given effect as if the former spouse had predeceased the divorced individual as of the time of the revocation” (emphasis added).
The statute in its current form was last amended in 2008, and became effective July 7, 2008:
“This act shall take effect immediately and shall apply only where the marriage of a person executing a disposition, appointment, provision or nomina *448 tion in a governing instrument, as defined in EPTL 5-1.4(f)(5), such section as added by section one of this act, to or for the benefit of a former spouse ends in a divorce or annulment, as defined in EPTL 5-1.4(f)(2), on or after such effective date or, where such a marriage ends prior to such effective date, only where such a disposition, appointment, provision or nomination takes effect only at the death of the person who executes it and such person dies on or after the effective date of this act” (L 2008, ch 173, § 2 [emphasis added]).
Stripped to essentials, the estate, Lexington and DFS all urge that, because (a) Susan was named beneficiary of the subject policy in 2002, (b) Susan and decedent were divorced in April 2008, and (c) Susan received $500,000 in insurance proceeds from policies other than the one at issue here (thus, so they contend, ensuring that decedent’s insurance obligation under the MSA was met), EPTL 5-1.4 operates to revoke any right Susan had as the 2002 named beneficiary under the subject US Life policy.
However, Susan, and all three of decedent’s children individually, contend (1) that, under the circumstances of this case, EPTL 5-1.4 is unconstitutional as applied to her, or, in the alternative, (2) that the facts and circumstances operate to take this case out from under EPTL 5-1.4, and (3) that other facts and circumstances warrant Susan receiving at least some, if not all, of the policy proceeds.
B.
In moving for summary judgment initially, Lexington was then addressing Susan’s original petition, and all papers submitted by the parties on that “cross motion” likewise dealt with what was before me prior to my September 19, 2014 decision. After that decision, which deferred Lexington’s accelerated judgment application, additional pleadings, and papers directed to that application, were filed. Thus, I have considered all papers and pleadings in the record in reviewing and determining the summary judgment application.
L
On a motion for summary judgment, the standards of review are well-established:
“As we have stated frequently, the proponent of a *449 summary judgment motion must make a prima facie showing of entitlement to judgment as a matter of law, tendering sufficient evidence to demonstrate the absence of any material issues of fact (Winegrad v New York Univ. Med. Ctr., 64 NY2d 851, 853; Zuckerman v City of New York, 49 NY2d 557, 562; Sillman v Twentieth Century-Fox Film Corp., 3 NY2d 395, 404). Failure to make such prima facie showing requires a denial of the motion, regardless of the sufficiency of the opposing papers (Winegrad v New York Univ. Med. Center, supra, at p 853). Once this showing has been made, however, the burden shifts to the party opposing the motion for summary judgment to produce evidentiary proof in admissible form sufficient to establish the existence of material issues of fact which require a trial of the action (Zuckerman v City of New York, supra, at p 562)” (Alvarez v Prospect Hosp., 68 NY2d 320, 324 [1986]; see also Powers v 31 E 31 LLC, 24 NY3d 84 [2014]).
Furthermore, as our Court of Appeals pointed out in Vega v Restani Constr. Corp. (18 NY3d 499, 503 [2012]): “On a motion for summary judgment, facts must be viewed ‘in the light most favorable to the non-moving party’ (Ortiz v Varsity Holdings, LLC, 18 NY3d 335, 339 [2011]).”
if
Lexington’s original motion papers consisted essentially of a copy of the legislative history of EPTL 5-1.4, as amended in 2008, and a memorandum of law. In its legal submissions, Lexington raised the following grounds for dismissal of Susan’s petition:
1. Surrogate’s Court “lacks jurisdiction to determine a claim that a statute of New York State is unconstitutional”;
2. Susan “has failed to establish a prima facie case” of entitlement to any of the relief she is seeking;
3. The legislative history of EPTL 5-1.4 “demonstrates that [Susan] has no claim to the policy proceeds”;
4. No basis exists for the imposition of a constructive trust on all or part of the policy proceeds.
Subsequently, Lexington filed papers seeking sanctions, fees and costs because Susan did not disclose in her original papers that she had received benefits from one or more policies other than the US Life policy.
*450 DFS’s final papers submitted in response to the Lexington motion state that it “does not oppose [Lexington’s] Motion,” and it expressly joins in Lexington’s request for ancillary relief (sanctions, fees and costs) against Susan. And, in its pleadings, DFS takes the position, similar to Lexington’s, that Surrogate’s Court is not the proper venue for determining Susan’s constitutional claims and that it “lacks jurisdiction” to decide them.
Susan opposes summary judgment. In the various papers she has submitted, she contends that this court does possess jurisdiction to entertain her constitutional claim, in regard to which she makes the following point:
“In the instant case, petitioner has not alleged that the statute is unconstitutional on its face. Rather, petitioner alleges only that because of the peculiar facts of her case, the application ofEPTL § 5-1.4 [to her] is unconstitutional. Surrogate’s Court, as a court of general jurisdiction insofar as matters that affect the decedent’s estate, has the power to determine this issue” (emphasis added).
Susan also submits several affidavits and documents in support of all her claims for relief.
C.
L
I turn first to the contention of Lexington and DFS that Surrogate’s Court has no jurisdiction to entertain Susan’s constitutional challenge to the statute. They argue that, because this court is one of limited jurisdiction, and because the challenge is in the nature of a declaratory judgment action (CPLR 3001), only Supreme Court is empowered to adjudicate the matter.[5]
[6]
In Private Client Group v Markey (2010 NY Slip Op 31038[U] [Apr. 15, 2010]), Nassau County Surrogate’s Court had before it a claim for declaratory relief against an estate. In holding that, where it otherwise has jurisdiction, Surrogate’s Court “can issue the equivalent of a declaratory judgment even though that discrete species of action known as the declaratory judgment action may be reserved to the Supreme Court,” the court noted:
“The Surrogate’s Court is a court of limited jurisdiction, whose subject matter jurisdiction is con *451 ferred solely by the State Constitution and by statute. As to matters within its scope of jurisdiction, it has power to make complete and equitable disposition of a case. However, these powers of disposition cannot provide the surrogate with any broader jurisdictional authority than that specified in statutes (Matter of D. D., 64 AD2d 898 [2d Dept 1978], appeal dismissed 49 NY2d 879 [1980], appeal dismissed 49 NY2d 916 [1980]). . . .
“SCPA § 209 [10] provides that ‘[i]n the exercise of its jurisdiction, the [Surrogate’s] court shall have all of the powers that the supreme court would have in like actions and proceedings including, but not limited to, such incidental powers as are necessary to carry into effect all powers expressly conferred herein.’ That this jurisdictional grant is broad does not completely answer the question (see Matter of Langfur, 198 AD2d 355, 355-356 [2d Dept 1993] (where the court held that ‘there is no need to address the issue of whether the surrogate’s court may also grant a declaratory judgment’).
“In Carmel v Shor, 250 AD2d 475, 476 [1st Dept 1998], the court held that the Surrogate’s Court could grant the relief requested, ‘albeit not necessarily in the form of a declaratory judgment.’ The First Department relied upon the decision in Matter of Greenwold (236 AD2d 400, 401 [2d Dept 1997] [citations omitted]). In that case, the Second Department held:
“ ‘We find that, although . . . the decedent’s widow, initiated this matter in the form of an action for a declaratory judgment in the Supreme Court, it was proper for the Supreme Court to transfer it to the Surrogate’s Court, in which there was a separate proceeding pending. The issues are relevant to the settlement of the affairs of the decedent, and the Surrogate’s Court could grant all the relief requested without issuing a declaratory judgment’ ” {id. at *6, *8 [emphasis added]).
Here, the issue before me is whether the estate or Susan is entitled to life insurance proceeds from decedent’s US Life policy. Clearly that is a matter which affects “the settlement of the affairs of the decedent” (Matter of Greenwold, 236 AD2d 400, 401 [1997]), as Lexington and DFS would be hard-pressed *452 to deny. Because this is so, this court has the power to grant all relief necessary in this proceeding (see SCPA 201 [3] [“The court shall continue to exercise full and complete general jurisdiction in law and in equity to administer justice in all matters relating to estates and the affairs of decedents”]).
I conclude that Susan’s as applied constitutional challenge is cognizable before me and that I have jurisdiction to determine it. Thus, the jurisdictional objections raised by Lexington and DFS must be dismissed.
ii.
When a constitutional challenge to a statute is made, the legal standards of review are clear. Our Appellate Division, in Matter of Destiny USA Dev., LLC v New York State Dept. of Envtl. Conservation (63 AD3d 1568, 1572-1573 [2009]), reiterated the overriding consideration to be observed:
“ Tt is fundamental that a court should not decide a constitutional issue except where it is unavoidable, and should not decide a case on constitutional grounds where the decision may be based on alternative, nonconstitutional grounds’ (Ajay Glass & Mirror Co. v County of Erie, 155 AD2d 988, 988-989 [1989]; see Rescue Army v Municipal Court of Los Angeles, 331 US 549, 569 [1947]; see also Matter of Vogel v Blackwell, 225 AD2d 1091, 1092 [1996])” (emphasis added).
Significantly, if the claim is not a facial attack on the statute — that is, a claim that the statute is constitutionally invalid under all conceivable circumstances — but rather, as here, only contends that the statute is unconstitutional “as applied,” the cases teach that such an “as applied challenge involves a determination as to whether a statute can be constitutionally applied to the [individual] under the facts of the case (People v Parker, 41 NY2d 21, 24 [1976]; see also Chapman v United States, 500 US 453, 467 [1991])” (People v Peak Carting, Inc., 11 Misc 3d 4, 8 [2005] [emphasis added]; see also People v Stuart, 100 NY2d 412, 421 [2003]).
In an “as applied” challenge, then, the “[factual context and [the individual’s] circumstances are critical” (United States v Laurent, 861 F Supp 2d 71, 93 [2011]; see also Tsirelman v Daines, 19 F Supp 3d 438, 447-448 [2014]).
Virtually all of the “critical” “[factual context and [the individual’s] circumstances” (United States v Laurent at 93) are *453 found in Susan’s petition(s) and affidavit material.[6] In this regard, the rule is clear that “ ‘[credibility of persons having exclusive knowledge of facts should not be determined by affidavits submitted on summary judgment motions, but rather at trial by the trier of facts’ (Koen v Carl Co., 70 AD2d 695)” (Fisher v Kavoussi, 90 AD2d 597, 599 [1982]; see also DeSario v SL Green Mgt. LLC, 105 AD3d 421, 422 [2013] [any determination based on credibility of the parties is to be determined at trial]).
Thus, a hearing will be required to explore all the issues raised by Susan’s as applied constitutional claim. The credibility of all relevant witnesses — Susan, possibly one or more of decedent’s children, possibly counsel who took part in the MSA negotiations, possibly US Life personnel, and others — will then be measured by traditional standards, which cannot be done on the papers submitted on this motion.
iii.
The necessity for a hearing on Susan’s as applied constitutional challenge also exists with respect to other claims by the parties. Whether the insurance proceeds received by Susan from policies other than the US Life policy satisfied decedent’s obligation under the MSA, or whether only the US Life policy proceeds could suffice in that regard, can only be decided after a hearing.
Likewise, and particularly because the constitutional issue should only be reached if no other resolution is possible, the question of Susan’s post-divorce “management” of the US Life policy, and decedent’s 2009 directions to US Life concerning that, may be significant in deciding who should receive the policy proceeds. Again, only after all relevant testimony has been provided can a fully informed determination be made as to the effect the MSA provisions, and decedent’s 2009 writing to US Life, have on these issues.
D.
In sum, I hereby dismiss the objection raised by Lexington and US Life to this court’s jurisdiction to entertain and decide Susan’s as applied constitutional challenge to EPTL 5-1.4. I further set down all other issues raised by the parties for an *454 evidentiary hearing before the Chief Attorney of this court, at a date and time to be set thereafter.
Finally, I hereby direct that all parties appear before me on Wednesday, July 22, 2015, at 9:30 a.m., for scheduling of the evidentiary hearing required herein, as well as such other matters as may then be required.

. The will, in effect, left everything to Susan. If she predeceased decedent, his will left everything to his three children (Mary, Mark and Sara).

. The “New York State Insurance Department N/K/A the Department of Financial Services” (hereafter, DFS), although not having been named or served with process, voluntarily filed a notice of appearance on May 13, 2014, together with a verified answer and an affirmation opposing Susan’s petition, and a memorandum of law. DFS has a claim against the estate for approximately $484,000 based on a 2010 judgment entered by it against decedent and a company he had operated.

. Susan says in her papers that “[fjor many years, the decedent was a successful insurance broker dealing with commercial lines and casualty insurance.”

. In her papers, Susan explained why the parties separated after so many years of marriage:
“In 2007, the decedent and I separated after significant differences arose between us. I discovered that the decedent had obtained home equity loans on our residence which was owned by me by having my name forged on mortgage documents. The decedent had encumbered my property by hundreds of thousands of dollars in loans obtained unlawfully, which required me to engage in substantial and lengthy litigation in order to straighten out that matter.”

. DFS suggests additionally that a federal court should hear the challenge.

. The submission of decedent’s three children is also relevant but is much more conclusory in nature.